## Jacob E. Johnson, et al. v. The People of the State of Illinois.

### Gen. No. 11,605.

1. CONSPIRACY—*when indictment charging, sufficient.* An indictment which charges a conspiracy to injure persons of a designated class, which class is sufficiently described, is sufficient.

2. CONSPIRACY—*when penalty for, not excessive.* The legislature has power to make the punishment for a conspiracy to do an illegal act, greater than the punishment provided for the doing of such act.

3. CONSPIRACY—*instruction as to burden of proof, etc., in prosecution for, approved.* The following instruction is approved:

"The court instructs the jury that in this case to justify a conviction of any one of the defendants, the burden is on the prosecution to prove by credible evidence, to the satisfaction of the jury, beyond all reasonable doubt, that such defendant is guilty as charged in the

indictment, of a conspiracy to injure non-union brass molders working for the Western Electric Company or The Stromberg-Carlson Telephone Manufacturing Company, or to prevent non-union brass molders from being employed by said companies by assaulting, beating, bruising or wounding them, or to injure the person of one Clay Bassa, one Ed Roebling, one Henry Thumann and one Fred Smith, and if the evidence fails thus to satisfy the jury of the guilt of any one or more or all of the defendants, it is the duty of the jury to acquit each and every one of the defendants as to whom there is such a failure of proof. The jury are not at liberty to adopt unreasonable theories or suppositions in considering the evidence, in order to justify a verdict of conviction as to any defendant; but if any reasonable view of the evidence is or can be adopted, which admits of a reasonable conclusion that the defendants, or any of them, are, or is, not guilty as charged in the indictment, or which raises and sustains a reasonable doubt of said guilt, it is the duty of the jury to adopt such view of the evidence and acquit those to whom that conclusion applies."

4. CONSPIRACY—*instruction as to essentials of crime of, approved.* The following instruction is approved:

"The court instructs the jury that the indictment in this case charges the defendant with the specific crime of conspiracy to injure certain persons who are designated as brass molders who do not belong to the Unions working for certain corporations; it is therefore not proper to find the defendants guilty on proof of having formed an executive committee merely for some evil purpose; nor is it proper to convict any one of the defendants merely because he was at one time a member of said executive committee, even if you believe from the evidence that said executive committee was formed for some evil purpose; before you can convict any one of the defendants it must be clearly proved, beyond all reasonable doubt, that he conspired with some other person indicted with him to commit the identical offense charged."

5. CONSPIRACY—*instruction defining, approved.* The following instruction is approved:

"The essence of the crime of conspiracy is the intent and the agreement; unlawful acts of individuals, no matter how numerous, cannot be called a conspiracy, unless it appears that the minds of the persons committing such acts had previously met and agreed upon a common purpose contemplating something unlawful, either as the final object of the agreement or as a means of accomplishing it. Therefore, even if you believe from the evidence that lawless acts were committed, still unless it is proved beyond a reasonable doubt that the defendants or some of them had the intent and came to an agreement which tended to result in such acts, it is your duty to acquit the defendants; and moreover, it is not sufficient to convict the defendants to prove even that they conspired to do lawless acts, such as using threats and intimidation; in this case in order to warrant a conviction the intent to injure the person by beating, bruising and wounding must be shown; otherwise it is your duty to acquit the defendants."

6. CONSPIRACY—*instruction as to what essential to crime of, approved.* The following instruction is approved:

Johnson v. The People.

"The court instructs the jury that in order to constitute the crime of conspiracy there must be certainty to a common intent and the object to be accomplished must be an evil one, or it is to be accomplished by evil means. It is not enough, therefore, to show that the defendants on trial may have had a common object to succeed in their strike, such as is common for men on strike to have, and that some one else indicted with them attempted to accomplish that object by evil means. Before any one of these defendants can be found guilty, it must be shown beyond a reasonable doubt that he agreed with such other person, if you believe from the evidence that there was such a person, to accomplish such object by such evil means."

7. CONSPIRACY—*how must be proved.* The object of a conspiracy must be proved as laid in the indictment, and in order to show conspiracy something more is required than proof of the mere passive cognizance of an illegal action intended or desired by others; there must be something showing active participation of some kind by the parties charged.

8. CONSPIRACY—*when members of executive committee of labor organization not guilty of.* Held, from the evidence in this case, that the evidence was not sufficient to charge the members of the executive committee of a certain labor organization as guilty of the crime charged.

9. CONSPIRACY—*what evidence not sufficient to convict.* The evidence of a decoy detective to the effect that he hired himself to the defendants to do a criminal act, and that he did such act at the instance of the defendants, is not sufficient to convict of a criminal charge.

10. CONSPIRACY—*what evidence incompetent in prosecution for.* Evidence which does not relate to the particular conspiracy charged in the indictment, is incompetent.

11. INDICTMENT—*when names need not be alleged in.* Unless the names constitute an essential part of the crime charged they need not be alleged in an indictment, and the fact that the persons where described as unknown are not in fact unknown to the grand jury, is not vital.

12. CRIMINAL LAW—*what offenses are separate and distinct.* A conspiracy to do bodily injury to certain persons and a conspiracy to prevent certain persons by unlawful means from being employed by certain corporations, are separate and distinct offenses where defined by different sections of the criminal code and subject to different punishments.

13. ELECTION—*when within discretion of court to refuse to compel, by State's attorney.* Where several distinct offenses are charged in the several counts of an indictment, it is within the discretion of the court whether to compel the State's attorney to elect under

which counts he will proceed where none of such counts charges felonies.

14. CONVICTION—*when set aside on appeal.* The Appellate Court will set aside a conviction for conspiracy where from all the evidence there remains with such court a serious and well-founded doubt of the guilt of the accused.

15. WITNESS—*right to account for absence of.* A party failing to produce a material witness is entitled to show the reason for such failure.

Criminal prosecution for conspiracy. Error to the Criminal Court of Cook County; the Hon. THEODORE BRENTANO, Judge, presiding. Heard in this court at the March term, 1904. Reversed and remanded. Opinion filed January 4, 1906.

**Statement by the Court.** The plaintiffs in error were convicted in the Criminal Court of Cook county in January, 1903, of conspiracy, and their punishment fixed by the jury as follows: Jacob E. Johnson to pay a fine of $1,250; William H. Mangan to pay a fine of $1,250; Thomas Christie to pay a fine of $750, and Gustav Hoppe to pay a fine of $750.

The indictment on which they were convicted joined with them seven other defendants—Harry Forbes, Gus Johnson, William L. Maloney, Andrew Anderson, Charles R. Smoot, and one Leslie and one Smith, whose first names were alleged to be unknown. Of these Smoot first pleaded not guilty, but retracted said plea and pleaded guilty before the trial. He was a witness for the State against the defendants who were tried.

Harry Forbes, Leslie and Andrew Anderson were never arrested or brought before the court in any manner. It is apparent from the record that "Harry Forbes" was a misnomer for one Harry Ford, who was a member of the executive board of the Brass Molders' Union, hereinafter referred to; but Ford was not arrested and did not appear. Leslie was only incidentally mentioned in the testimony in the cause as a person "hanging around the Western Electric Works" while a strike was going on there. Andrew Anderson figures largely in the testimony of the witnesses for the prosecution as a hired slugger, but was not brought be-

Johnson v. The People.

fore the court.    The plaintiffs in error professed ignorance of his identity and even of his existence.

Concerning the Smith intended by the indictment in the first instance there appears to be some confusion, but the State arrested and brought before the court after the trial of the plaintiffs in error one John Smith or "Schmitt," alluded to in the testimony under the soubriquet of "Red" Smith.    He pleaded guilty and was sentenced to pay a fine of $200 and costs, which was paid.

Gus Johnson and William L. Maloney were tried with the plaintiffs in error, and were acquitted.

The indictment on which the plaintiffs in error were convicted consists of eight counts.

The gist of the first count is, that the eleven defendants unlawfully conspired together in July, 1902, to injure the person of each and every man then working as a brass molder for the Western Electric Company who was not then a member of the Brass Molders' Union Local No. 83, by assaulting and beating him.

The second count charges the defendants with the same thing, but alleges specifically that the assault was to be by the hands of the defendants and by various deadly weapons.

The third and fourth counts charge the defendants with like conspiracies by like means to injure the person of each and every man then working as a brass molder for The Stromberg-Carlson Telephone Manufacturing Company, who was not a member of said Brass Molders' Union.

The fifth and sixth counts charge the defendants with a conspiracy by like means to injure the person of each and every person working as a brass molder for either The Western Electric Company or the Stromberg-Carlson Company who was not a member of said Union.

The seventh count alleges that the defendants conspired and agreed together, with malicious intent, to injure the persons of Henry Thumann, Clay Bassa, Fred Smith and Ed Roebling, by assaulting, beating, bruising and wounding the said Thumann, Bassa, Smith and Roebling with their hands

and "with divers knuckles, revolvers and other dangerous and deadly weapons."

These seven counts charge an offense under section 46 of the Criminal Code of Illinois, approved March 27, 1874, as amended by act approved June 16, 1887, which reads as follows so far as it affects this cause:

"If any two or more persons conspire or agree together, * * * * with the fraudulent or malicious intent wrongfully and wickedly to injure the person, character, business * * * * or property of another, * * * * they shall be deemed guilty of a conspiracy, and every such offender * * * and every person convicted of conspiracy at common law shall be imprisoned in the penitentiary not exceeding five years or fined not exceeding $2,000, or both."

The eighth count of the indictment charges the defendants with unlawfully combining, confederating and agreeing together for the purpose of preventing by unlawful means, to wit, by assaulting, beating, bruising and wounding them, divers persons employed by The Western Electric Company and The Stromberg-Carlson Telephone Manufacturing Company from being so employed by said corporations on such terms as said persons and said corporations had agreed on.

This count is based on section 158 of the Act of 1874, as follows:

"If any two or more persons shall combine for the purpose of depriving the owner or possessor of property of its lawful use and management, or of preventing by threats, suggestions of danger or any unlawful means, any person from being employed by or obtaining employment from any such owner or possessor of property on such terms as the parties concerned may agree upon, such persons so offending shall be fined not exceeding $500, or confined in the county jail not exceeding six months."

Before the arraignment of the plaintiffs in error a motion was made by them to quash the indictment, which motion was overruled by the court. After they had been arraigned

and pleaded not guilty, a motion was made in their behalf that the State's attorney should be compelled to elect upon which count of the indictment he would rely for conviction, which motion was overruled.

During the trial various questions concerning the admission and exclusion of evidence, which are as far as necessary discussed in the opinion following, were raised and decided.

After the evidence for the State was completed, the motion to require the State's attorney to elect on which count of the indictment he would proceed and to state on which count he relied, was renewed and again denied. A motion was also then made to dismiss the cause for the reason that the State had failed to establish a *prima facie* case in manner and form as charged in the indictment, which motion was denied.

After the completion of all the evidence the plaintiffs in error unsuccessfully moved to dismiss the cause against them on the whole evidence.

Sixty-five instructions were given to the jury by the court, to many of which exceptions were taken by the plaintiffs in error. Fourteen, offered by plaintiffs in error and other defendants, were refused; one offered by them was modified before it was given.

After the verdict, the plaintiffs in error made and argued a motion for a new trial, which was denied. They then made and argued a motion in arrest of judgment, which motion was also denied. Judgment and sentence being passed against each of the plaintiffs in error, respectively, in accordance with the verdicts, they sued out a writ of error from this court assigning errors here which cover all the questions raised in the court below before, during and after the trial, by their various objections and motions before mentioned, to the adverse action of the court below on which motions exceptions had been in each case duly preserved.

LEON HORNSTEIN, for plaintiffs in error.

CHARLES S. DENEEN, State's Attorney, and HARRY OL-·
SON, Assistant State's Attorney, for defendant in error.

MR. JUSTICE BROWN delivered the opinion of the court.

There are certain questions raised on this writ of error
which it seems well to dispose of, before we discuss proposi-·
tions which seem to us controlling. As we feel ourselves
compelled to reverse the judgment and remand the cause, it
is desirable that our opinion on matters which might arise on
another trial should thus be indicated.

In support of the position that the indictment should have
been quashed on the motion made before trial,. it is argued
by plaintiffs in error that the first six counts are vitiated by
the omissions to charge that there were persons working for
the Western Electric Company and The Stromberg-Carlson
Telephone Manufacturing Company, respectively, who were
brass molders but not members of the Brass Molders' Union.
We do not consider this point well taken. The indictment
in these six counts charged the defendants with a conspiracy
to injure the persons of each and every individual then
working as brass molders for these companies "who were
not members of Brass Molders' Union Local No. 83." This
completed a sufficient description of the crime charged.
It designated a class. The indictment did not need to do
more. Proof, however, that there were such persons would
be necessary to a conviction. Such proof was present in
this case. We think, therefore, that the State's attorney is
right in his contention that the allegation that there were
divers persons whose names were unknown to the jurors then
and there working as brass molders for said Western Electric
Company, was surplusage.

The same considerations make it apparent that the ob-
jection to these counts that the names of the persons con-
spired against are represented in the unnecessary additional
matter as unknown to the jurors, while the proof failed to
show this, is not well taken. It is not like the cases cited
by the plaintiffs in error, where the allegation of some name·
or the allegation that such name was unknown to the grand

jurors was necessary in the description of the crime.    In such cases, although there is some conflict of authorities upon whom the burden of proof rests regarding the actual ignorance or knowledge of the grand jurors, the general rule seems to be that the allegation of ignorance if attacked must be sustained to warrant a conviction.    But we hold here that it was not necessary to name, otherwise than by description of a class, the persons conspired against.

We agree with counsel for plaintiffs in error that they had the right to be fully apprised of the nature of the charge against them, and that a concealment of the real nature of such charge by the phraseology of or lack of obtainable. precision in the indictment would be fatal, but we think that in these six counts complained of, the offense is so set out that the defendants were fully informed of what they should be prepared to meet on the assumption that nothing but evidence proper under the indictment was produced against them.    Errors in the admission of improper evidence we shall have occasion to discuss hereafter.

Another contention of plaintiffs in error with which we are unable to agree, is that it was reversible error for the trial court to refuse to compel the State, before the trial and again after the evidence for the prosecution was completed, to elect on which count or counts of the indictment it would proceed.

Plaintiffs in error claim that there are four distinct offenses alleged in the indictment, and without delaying to discuss any question concerning which there can be dispute, it is perfectly plain that two distinct offenses at least are charged—offenses differing greatly in moral turpitude and in importance to society and provided for by entirely separate and distinct provisions of the Criminal Code of Illinois. One is a conspiracy to do bodily injury to certain persons, and is punishable at the discretion of a jury by a five-years term in the penitentiary in addition to a fine of $2,000. The other is a conspiracy to prevent certain persons by unlawful means from being employed by certain corporations on such terms as those persons and corporations had agreed

on.   The punishment for this in the discretion of the jury is a fine not exceeding $500, or confinement in the county jail not exceeding six months.

It does not make this last-described offense identical with the first, that under a *videlicet,* the "unlawful means" which the alleged conspirators are said to have agreed on, are described as bodily injuries.   The words, like some we have noted in the counts before discussed, are surplusage.   The crime charged is completely described without them.

Nor does the fact that a conspiracy, "a combination, confederacy and agreement" which is unlawful, is the gist of the offense, and not the overt acts which are the object of that conspiracy, make the two conspiracies charged any the less distinct offenses.   There may undoubtedly be one conspiracy to do two or more unlawful things charged in an indictment, but a charge by itself of a conspiracy to do personal injury, is an entirely different allegation from a charge by itself of a conspiracy to prevent employment on agreed terms.

It follows that as the plaintiffs in error were accused of at least two distinct offenses in the same indictment, it was within the discretion of the trial court to compel the prosecution to confine the evidence to one of the offenses, or to elect one charge to be submitted to the jury after the evidence was taken.   Had the offenses charged been felonies, this would have been the absolute right of the defendants had they demanded it.   But said offenses both being misdemeanors under the construction given to our statute by the Supreme Court in Lamkin v. The People, 94 Ill., 501, and subsequent cases, they might, although distinct, be joined in the indictment, and it was a matter of judicial discretion and not of right whether the State should be put to the election demanded.   Goodhue v. The People, 94 Ill., 37.   It would, however, seem that although a conspiracy to do bodily injury must be classified as a misdemeanor for certain purposes, yet the fact that it may be punished by a long term in the penitentiary furnishes a reason for the same extraordinary vigilance as to the defendants' rights as the law de-

Johnson v. The People.

mands in the cases of crimes classified as felonies, where the punishment may be no greater.

To quote from the opinion of the court in Commonwealth v. Manson, 2 Ashmead, 38, a case cited by the counsel for The People, "A technical rule of criminal practice, having more authority than reason to recommend it," is "that although where a party is charged with different felonies in one indictment, he can, as a matter of right, demand of the Commonwealth to elect before trial for which of them she will proceed against him, yet this important privilege does not obtain in prosecutions for misdemeanors (1 Chitty's Criminal Law, 208), a hard distinction in a case like the present, where, although it is called a misdemeanor, the punishment in case of conviction equals that inflicted on the most atrocious felonies."

But this consideration, although ground for appeal to the discretion of the trial court, does not, we think, in a case like the present, stamp a refusal of that court to interfere as reversible error through abuse of that discretion.

We are in any event saved some confusion that might otherwise exist through the joinder and prosecution of the two distinct offenses, by our ability definitely to determine that it was under one or more of the first seven counts that the plaintiffs in error were found guilty. The jury were instructed in the instruction marked (65–64–63) as to the form of their verdict, and the amounts at which they fixed the respective fines under that instruction show that they found the defendants in error guilty under the first seven counts or one or more of them.

We must in any case treat the verdict which did not mention the eighth count especially as one of acquittal of the offense charged therein. The jury were explicitly told that if they found the defendants guilty under the eighth count, they must insert in given blanks a sum less than $500 or a term not exceeding six months. To avoid all obscurity and confusion they might well have been told that a verdict on that separate count should be given separately in some form; or that their verdict, if single and a finding of guilty on all

the counts, should, in fixing the penalty of a fine, indicate that the fine included the smaller amount allowed in case of a conviction under the eighth count.

In view, however, of the language of the instruction as given, and the silence of the verdict in relation to particular counts, we think that the proper effect to give to the general verdict is to consider it as one of conviction on the first seven counts and of acquittal on the eighth. And thus the court treated it in entering judgments on the verdicts— the judgment in each case being that the defendant was guilty "of the crime of conspiracy to injure the person of another." "Etc." was added in each case to this description of the crime, but it can hardly be construed as having any signification.

Of course the judgment and sentence would have been erroneous if the conviction had been on the eighth count only, and we do not think that standing as it does, without explanation or discrimination, the language of verdict or judgment can be applied to such count at all. Hereinafter, therefore, we shall in discussing the weight of the evidence, its sufficiency to sustain a conviction and questions of its admissibility and competency, treat the same with reference solely to the counts for conspiracy to injure the persons of Henry Thumann, Clay Bassa, Fred Smith and Ed Roebling, and of all non-union brass molders working for The Western Electric Company and The Stromberg-Carlson Telephone Manufacturing Company, or one of them.

Before proceeding to the evidence, however, there are still other questions raised by plaintiffs in error that should be noticed.

The point is made that the verdicts imposed excessive fines. The ground is taken that it is error to impose a greater punishment for conspiracy to commit an offense than the statute has annexed to the offense itself. This undoubtedly was a rule laid down by many authorities as to a common law conspiracy to commit a common law offense, but even were it the law applicable to this case, it would be doubtful to say the least if a simple fine of $1,250 is

a greater punishment than the fine of $1,000 and the year in the county jail added which the statute fixes as a possible sentence for assault with a deadly weapon. But the rule has no application to the present case. The statute has defined the offense of conspiracy for which this indictment was brought and determined the punishment within certain limits, and this is controlling. The legislature indubitably possesses the power, in its discretion, to make the punishment for a conspiracy of two or more persons to commit a crime more severe than that of the crime itself, nor is any principle of natural justice thereby violated.

Assault with a deadly weapon, as a sudden act for example, may be, under many circumstances, even "where no considerable provocation exists," a less heinous and odious crime than a conspiracy to commit such an assault. The conspiracy shows premeditated wickedness and vindictive and inherent brutality, springing necessarily from "malignant and abandoned hearts." The penalties fixed by the jury on the hypothesis of the guilt of the defendants seem to us very much the reverse of excessive.

Nor do we find reversible error in the instructions of the learned trial judge. They are criticised by counsel for the defense as containing abstract propositions of law, which, although correct in themselves, were misleading to the jury by giving them to understand that they had a right to find the defendants guilty even if the offense against the law fell short of the charges in the indictment. If this were true, criticism would be just, for the question here was not one relating to any claimed or disputed rights of labor unions or striking workmen; it was an inquiry into the existence of a conspiracy to slug and maltreat citizens in the peace of the State, and into the alleged connection of the plaintiffs in error therewith, if the conspiracy existed. Before it was proper to find the plaintiffs in error guilty under the indictment, the jury should believe their participation in this precise crime proven by the evidence beyond a reasonable doubt. But this was exactly what the jury were told by numerous instructions, such as 53, 52, 38, 37, 36, 33, 32,

15

31, 30, 29, 28, 26 and 25, among others.    Some of these
we shall allude to more fully hereafter.    If with them, as
a part of the series and to give the jury a completer view of
the law, the court announced some abstract propositions con-
cerning individual rights of liberty and of freedom of con-
tract, sound in themselves, such as those in instruction 39,
which contains excerpts from the constitution of Illinois and
from that of the United States, we cannot think that the
plaintiffs in error were prejudiced thereby.

Nor do we find reversible error in the refusal of the in-
structions marked Refused—14, 13, 12, 11, 10, 8, 7 and 6.
In the view that we take of the ultimate disposition of
this cause here, it is unnecessary to discuss them farther
than to say that while they contain correct propositions of
law, those propositions are all, so far as they were necessary
to a proper presentation of the case; covered by the instruc-
tions which were given, and which as a series seem to us
fair and more than adequate.    If they erred as a whole,
they were too voluminous rather than incomplete.

We think that the substantial questions in this case were,
in the following given instructions, properly and fairly indi-
cated to the jury:

"(33)    The court instructs the jury that in this case to
justify a conviction of any one of the defendants, the burden
is on the prosecution to prove by credible evidence, to the
satisfaction of the jury, beyond all reasonable doubt, that
such defendant is guilty as charged in the indictment, of a
conspiracy to injure non-union brass molders working for
the Western Electric Company or The Stromberg-Carlson
Telephone Manufacturing Company, or to prevent non-union
brass molders from being employed by said companies by
assaulting, beating, bruising or wounding them, or to injure
the person of one Clay Bassa, one Ed Roebling, one Henry
Thumann and one Fred Smith, and if the evidence fails thus
to satisfy the jury of the guilt of any one or more of all of
the defendants, it is the duty of the jury to acquit each and
every one of the defendants as to whom there is such a failure
of proof.    The jury are not at liberty to adopt unreasonable

theories or suppositions in considering the evidence, in order to justify a verdict of conviction as to any defendant; but if any reasonable view of the evidence is or can be adopted, which admits of a reasonable conclusion that the defendants, or any of them, are, or is, not guilty as charged in the indictment, or which raises and sustains a reasonable doubt of said guilt, it is the duty of the jury to adopt such view of the evidence and acquit those to whom that conclusion applies."

"(32)   The court instructs the jury that the indictment in this case charges the defendants with the specific crime of conspiracy to injure certain persons who are designated as brass molders who do not belong to the Unions working for certain corporations; it is therefore not proper to find the defendants guilty on proof of having formed an executive committee merely for some evil purpose; nor is it proper to convict any one of the defendants merely because he was at one time a member of said executive committee, even if you believe from the evidence that said executive committee was formed for some evil purpose; before you can convict any one of the defendants it must be clearly proved, beyond all reasonable doubt, that he conspired with some other person indicted with 'him to commit the identical offense charged."

"(31)   The essence of the crime of conspiracy is the intent and the agreement; unlawful acts of individuals, no matter how numerous, cannot be called a conspiracy, unless it appears that the minds of the persons committing such acts had previously met and agreed upon a common purpose contemplating something unlawful, either as the final object of the agreement or as a means of accomplishing it.   Therefore, even if you believe from the evidence that lawless acts were committed, still unless it is proved beyond a reasonable doubt that the defendants or some of them had the intent and came to an agreement which tended to result in such acts, it is your duty to acquit the defendants; and moreover, it is not sufficient to convict the defendants to prove even that they conspired to do lawless acts, such as using threats and intimidation; in this case in order to warrant a conviction the intent to injure the person by beating, bruising and wounding must be shown; otherwise it is your duty to acquit the defendants."

"(30)   The court instructs the jury that in order to constitute the crime of conspiracy there must be certainty to a common intent and the object to be accomplished must be an evil one, or it is to be accomplished by evil means.   It is not enough, therefore, to show that the defendants on trial may have had a common object to succeed in their strike, such as is common for men on strike to have, and that some one else indicted with them attempted to accomplish that object by evil means.   Before any one of these defendants can be found guilty, it must be shown beyond a reasonable doubt that he agreed with such other person, if you believe from the evidence that there was such a person, to accomplish such object by such evil means."

If competent and properly admitted evidence in the voluminous record of over 1,300 pages before us, justified a verdict against the plaintiffs in error under the rules laid down by these instructions, and competent and material evidence on their behalf was not improperly excluded, we think that they have no just cause of complaint.   Their rights are fairly and fully stated in the instructions.   If, however, applying to the evidence shown by the record, the test which these instructions rightly insist on, there remains with us a serious and well-founded doubt of the guilt of the plaintiffs in error, because we deem the verdict to be unsupported by evidence or the clear preponderance of conflicting evidence to be against it, we are under obligation to reverse the conviction and grant a new trial.   Rafferty v. The People, 72 Ill., 37; Falk v. The People, 42 Ill., 331; Mooney v. The People, 111 Ill., 388; Gainey v. The People, 97 Ill., 270.   And especially are we under obligation in such a case, not through deference to the findings of the jury and our strong indisposition to usurp their functions of passing on the credibility of witnesses and the weight of conflicting evidence, to allow a conviction to stand if it appears that improper evidence probably or even possibly injurious to the accused, and likely to distract the minds of the jury from the real issues submitted to them, has been admitted on the offer of the prosecution, or that other evidence com-

petent and material for the defendants has been excluded. In cases where the material evidence for the prosecution is circumstantial and scanty, and from doubtful sources, it becomes peculiarly necessary carefully to guard against the introduction of extraneous matter to the prejudice of defendant's right to a fair trial on the particular crime charged.

The record in this case discloses that in the early part of 1902 there were labor troubles at the works of the Stromberg-Carlson Telephone Manufacturing Company and of the Western Electric Company in Chicago. The trouble at the Stromberg-Carlson Company began with a rupture between the employees and certain labor unions over a "closed shop" agreement, and half a dozen brass molders and thirty-six metal polishers left the employ of the company January 31, 1902. March 18, 1902, a strike began at the Western Electric Company, and the brass molders of that company's works left their jobs. The metal polishers remained at work. From this time on "picketing," seemingly with its usual if not inevitable incidents of violence and criminal assaults, was in operation at both plants. The record discloses some of the violence. Thus, one Lars Hanson, neither a brass molder nor a metal polisher, but a workman in the annunciator department of the Western Electric Company, who had never had any trouble with anybody, was shot at and seriously injured on the Jackson street viaduct. Whether he was mistaken for another, or why he was thus attacked, does not appear. One Clay Bassa, a non-union brass molder in the Western Electric Company, was pushed roughly while near the elevated railroad station at Canal street, by Charles Smoot, who was indicted and pleaded guilty as one of the conspirators, but who on taking the stand for the State swore that he had been employed as a detective by the Manufacturers' Information Bureau at about the time of this alleged assault, "to find out who did the slugging," and had had at least a preliminary interview concerning such employment at $70 a month before at the instigation or employment of Jacob Johnson, as he says, he

did the "pushing" in question. He remained in the employ-
ment of the Detective Bureau and in receipt of his salary
up to the time that he gave his testimony, although he had
been arrested and lodged in jail and pleaded guilty as one
of the indicted persons in this cause.

It appears also in the record, by his own testimony, that
in the latter part of July, 1902, another brass molder named
Henry Thumann, who was also a detective or spy in the
employ of a detective agency with headquarters in Cleveland,
and of the Manufacturers' Information Bureau in Chicago,
and had been so for more than two years, during which
time he had joined and become secretary of the Brass Mold-
ers' Union Local 83, was, as he swears in this case, assaulted
with brass knuckles by one "Andrew Anderson," who was
indicted with the plaintiffs in error, but was never arrested
or otherwise identified except by the description given of
him in the testimony of Albert Fridley, the chief witness
for the prosecution, and of Thumann and of one James Don-
nelly. Thumann and Donnelly say that they knew Ander-
son because he had been pointed out under that name by
Fridley. Thumann says his eye was badly hurt and he was
laid up for two weeks, and that Anderson ran away. Frid-
ley also says that he saw "Anderson" on Clinton street strike
a metal polisher, whose name he did not know, across the eye
and cut his face open.

Besides these assaults directly appearing from testimony
in the record, Mr. Johnson, the treasurer of the Stromberg-
Carlson Company, testified that he heard of men being hurt,
among others the foreman of their brass molders, and that
in conversation he charged Jacob Johnson, one of the plain-
tiffs in error, with responsibility for it, which Johnson de-
nied.

For the shooting of Hanson, a man named Sturch, who
was a member of the Metal Polishers' Union and a picket
employed by that Union at the Stromberg-Carlson works,
was arrested, but it does not appear that the accusation
against him went further than the Desplaines Street Po-

lice Station. In argument of counsel it is said he was discharged.

For the assault upon Thumann, Thumann himself swore to criminal complaints within two or three days thereafter against William Mangan and Jacob Johnson, alleging that they had unlawfully assaulted and beat him, and also that they had been guilty of disorderly conduct tending to a breach of the peace, but made no complaint against Anderson. Of the discrepancy between these complaints concerning the assault on him July 22, 1902, and his testimony in this case, Thumann furnishes no explanation. That which is furnished for him in the argument of the counsel for the People, that "he did not then know Andrew Anderson by name, but well knew that Johnson and Mangan were behind the assault," seems to be a pure assumption and one, according to his testimony in this case, directly contrary to the fact. In his testimony he particularly describes "Andrew Anderson," and says that he met him three times; that the first time was in the first part of July, 1901, when "Fridley pointed him out to me as Andrew Anderson"; the second time some days later, and the third and last time when he was slugged, at which time he says he knew at the very moment that the man who hit him was Andrew Anderson.

What became of these complaints against Mangan and Johnson does not appear, but except as to these apparently futile proceedings the record is silent as to any attempt to apprehend, prosecute and bring to justice by direct and individual proceedings against them, the persons who committed these outrages. On the first of August, 1902, however, about a week after the assault on Thumann and his complaints against Johnson and Mangan for the assault which he now swears Anderson committed on him, the indictment in the present cause was found by the grand jury, presumably largely on Thumann's testimony, as his name heads the list of witnesses, endorsed on it. This testimony, it may properly be inferred, was repeated by him at the trial. The indictment, as before set forth, was for conspiracy, and the conspirators were alleged to be Jacob E.

Johnson, William H. Mangan, Thomas Christie, Gustav Hoppe, Harry Forbes, Gus Johnson, William L. Maloney, Andrew Anderson, Charles R. Smoot, ———— Leslie and ———— Smith.

Investigation of the record would seem to indicate that Anderson and Smith (and perhaps Leslie, who seems unidentified) were supposed to be the actual and *bona fide* executors of the designs of the conspirators, that Smoot also was understood to have posed as a "slugger" and been thought one by the other conspirators, while in fact he was a decoy and detective, and that the principle of selection which picked out from among the members of the Union and the strikers and their sympathizers as co-conspirators with these men, the seven others, that is, the two Johnsons, Mangan, Christie, Hoppe, Forbes and Maloney, was that according to the testimony of Thumann they were the members of an executive committee of Brass Molders' Local Union 83 elected or appointed in February or March, 1901, a year before the strikes involved took place. The inference is irresistible that the theory on which this indictment was framed and prosecuted was that the formation of this committee was the beginning of a criminal conspiracy which culminated in outrages committed in the spring of 1902. This theory, indeed is avowed by the counsel for the People, who allege in their "Statement of Facts" that "This committee planned to assault these non-union men"; "they planned an assault upon Metz," etc., and farther on in their argument assert that "The formation of the Executive Board" (in the early part of 1901, after deliberation concerning it in 1900), "was the beginning of a conspiracy *which culminated in a strike which began about February 1, 1902,*" and that "The testimony of Henry Thumann shows that the defendants organized said committee for the purpose of conducting strikes by means of a wrecking crew which was to do violence to non-union men employed at Stromberg's and the Western Electric, and to keep secret the expenditure of such moneys as might be needed for said illegal purposes."

If these assertions were supported by the evidence, two

things would certainly be difficult to understand—one why a criminal conspiracy to do bodily harm to non-union brass molders who should be working a year later on at the two places involved should be formed, when the strikes, out of which the animosity against these molders grew, had not been called, or, as far as the evidence discloses, thought of; the second, why, under this theory, the jury should have acquitted the defendants, Gus Johnson and William L. Maloney. Maloney was a member of this executive committee during at least six months, shortly after its formation, and was recording secretary of the Union up to the time of the strikes and alleged assaults. Gus Johnson was a member of the executive committee from June or July, 1901, until the middle of May, 1902, and treasurer of the Union, with the expenditure of the money of the Union under his control, from December, 1900, to June, 1902.

If to be a member of the executive committee described was to be *ipso facto* a criminal conspirator for the objects alleged in the indictment, these men were certainly as guilty as the plaintiffs in error. If further evidence than mere membership and participation in the deliberations and plans of this committee were required, some of the defendants might well be differentiated, but in that case it would be apparent that in and by itself the committee was not a conspiracy, nor its members, by virtue of their membership, criminal conspirators. We have searched the record in vain in this view to find anything more incriminating, however, against Hoppe and Christie than there is against Gus Johnson and Maloney. It is true that Fridley testified that on one occasion when he had pointed out two men to Christie as molders who were working at Stromberg-Carlson's, Christie swore about them, and used to him, Fridley, indecent and violent language regarding them. That, however, was not any proof tending to establish the conspiracy charged here. It is impossible to avoid the conclusion that if the acquittal of Gus Johnson and Maloney were right, the conviction of Hoppe and Christie was wrong. It is our opinion that Johnson and Maloney were properly acquitted. The

only evidence which tends to establish the guilt of Gus John-
son and Maloney, who were acquitted, or of Hoppe and
Christie, who were convicted, is the evidence relied on to
establish the proposition that the executive committee spoken
of was in its inception and development a criminal con-
spiracy, formed for the purposes with which in this indict-
ment the defendants were charged. It falls, in our opinion,
short of establishing the proposition. Concerning the forma-
tion of a committee, the evidence for the State was furnished
by one Henry Thumann, who was, in the spring of 1900 and
thereafter a detective in the employ of a detective agency
in Cleveland and of one in Chicago employed in labor
troubles by the employers. He had in that capacity joined
the Brass Molders' Local Union, No. 83, and been elected
secretary. He was, therefore, in a favorable situation to
secure and make reports of the action of the Union. Be-
coming suspected as a spy upon the business of the Union, an
accusation of it was made against him by the president of the
International Union of Federated Metal Trades, with which
various local Unions were connected, and a trial took place
in July, 1901, before a joint executive board of delegates
from four local Chicago Unions of metal workers, one of
which was the brass molders' local 83. Thumann, over his
protests that he was not a detective spy, was found guilty
and expelled from the Union. According to twelve wit-
nesses who were present, one only of whom, Maloney, was
an interested party in this prosecution, Thumann upon this
judgment in a rage, with profanity and obscenity, threatened
revenge. This Thumann himself denied. He denied also
a conversation which one Klenzendorf, who was a witness
before the grand jury, swore to having had with him after
the grand jury hearing, in which he is reported to have
again said he "would get even with them fellows, this case
is going to break them up," and in which he said, "I was
looking for witnesses and I knew this case was coming up.
I am a detective and no foreman. I knew this case was
coming up before I hired you fellows" (referring to hiring
the persons present, Fridley, Bassa, Roebling and Smoot, to

work at the Western Electric Foundry). "All I wanted was witnesses;" and in this last denial he was sustained generally by the testimony of Fridley and Bassa,. Judd and Roebling, who swear they heard no such remarks, except that Bassa says that Thumann did then say "he would get even with those fellows, he would break them up."

Thumann's former partner for about a year in Pittsburgh, testified that Thumann's reputation in Pittsburgh for truth was bad, and that he would not believe him under oath. Similar impeaching testimony was given by another witness from Pittsburgh. The State, on the other hand, produced a former employer of Thumann from Pittsburgh, and several witnesses from Chicago, who knew him and had never heard his reputation for truthfulness questioned.

It cannot be said that he was very° successfully impeached by the witnesses as to his reputation, but it can hardly be reasonably disputed that he was a detective and informer who joined the Union for the purpose of discovering something objectionable and had evidently a strong interest to recommend himself to his employers by doing so, and the great preponderance of evidence makes it also plain that he felt and expressed great rage at and hatred for the defendants or their close associates after he had been expelled from the Union. These things and the utterly unexplained discrepancy between his complaints against Jacob Johnson and William Mangan for an assault on him, and his testimony in this case about its commission by one Andrew Anderson, who, in the said complaints he did not mention, make it necessary that his testimony should be received with great caution, when it is relied on to convict people of dastardly crimes against their positive denials and against evidence of previous good character.

Thumann testifies as to the formation of the committee in question, that about May, 1900, Mangan, one of the plaintiffs in error, was business agent of Local 83, Brass Moulders' Union, of which he, Thumann, was then a member, and the proceedings of which, he had made a contract as a detective to report to a detective agency; that there was at that

time an executive board of the Local, but that it had no independent power and was obliged to report all its transactions back to the Local Union; that Mangan suggested, at a meeting of this Local Union, that it should have an executive board, with full power, which should have money for any emergency they needed, and should not be obliged to go before the Local to explain what they wanted it for. Thumann said he did not remember who was present when this suggestion was made, but that most of the members were present regularly; that Mangan explained that the manufacturers were getting information of the doings of the Local and that the secrecy of the proposed executive board would do away with that. There was not much discussion then, Thumann says, but about a month later (this would be in June or July, 1900), Mangan made an oral report, in which he said, "It is very necessary we should have an executive board. I have been going down to Stromberg-Carlson's, and trying to get these men to come into the Union. When I go down there, I cannot meet them. If I go in front, they go out the back way, and the only way to get around this thing is to have a board with some power, some money on hand, and we will hire a wrecking crew and we will get some logs and drop the logs down on them (using a vile epithet) in the basement. That is the only way to get square with those people." Thumann says that he did not hear any of the other defendants, except Jacob Johnson, talk on this subject, but that Jacob Johnson succeeded Mangan as business agent of the Local about August 1, 1900, and made a statement to the Local that he didn't want to make any more reports before it, but that an executive board ought to be got together with full power, to which he could make his report, and from which he could receive his instructions, and that in October or November, 1900, he, Thumann, had a talk with Jacob Johnson in a small shop which Thumann was running on West Lake street. The other defendants were not there. Johnson repeated to him then the same things that Mangan had said in the Union. Thumann's words are, "He said 'We have got to get an execu-

tive board, as under the circumstances the Local cannot go on. The manufacturers get too much information of everything that is passing. We will probably get into some trouble later on, and we want this board in operation. We should have a certain percentage, about ten per cent, from the dues as an emergency fund, and the only question was how to bring it before the Local so that the members would not ask questions of what the money was to be used for.' If the board was in existence he could arrange things all right, and he stated that a lot of fellows at Stromberg-Carlson's were working there that he could not bring into the Union, and that the only way to do that would be to force them, if necessary to hire a wrecking crew to do it, but it takes money, and we cannot go before the Local and have the members ask questions of what the money is going to be used for. I advised him to get some of the members posted so they would not be too inquisitive if the motion was brought up. He said it was a good idea."

Thumann testified that about two weeks later (which might make it at the latest in December, 1900), Maloney made a motion to have an executive committee elected and that it get a certain percentage (about ten per cent) from the gross receipts, that it consist of seven members and the president and business agent, making nine; that the motion was carried; that Maloney objected to the way the motion was first written, and that he, Thumann, as secretary, was told "to fix it up, you know how it ought to be." At this meeting Thumann says Jacob Johnson, Maloney and Gus Johnson were present, and that he is not positive about the other defendants. A month or so later, he says, the committee was elected—Mangan, Maloney, Gus Hoppe, Christie, Renard, Jacob E. Johnson and *two* others, whose names he could not remember, but he added immediately, in answer to the question in direct examination, "Then all these defendants here were elected members of the board?" that they were. The fair inference is that he meant to include Gus Johnson, who was, at all events, a member of the committee from June or July, 1901, to the middle of May, 1902.

The purpose thus indicated by Thumann in the forma-
tion of this executive committee is the sole basis of the
State's contention that it was in its inception a conspiracy,
which in the language of the argument of counsel for the
People, "culminated in a strike which began about Feb-
ruary 1, 1902," and which, in the language of the indict-
ment, was a conspiracy to injure the person of each and
every individual working as a brass molder for the Western
Electric Company and for the Stromberg-Carlson Telephone
Manufacturing Company, not a member of Brass Molders'
Union, Local 83.

Objections to this evidence concerning the formation of
this executive committee was made, because any offense
shown by it was barred by the statute of limitations. We
need not now stop to discuss this point. It was doubtless
overruled on the theory of the law assumed in Ochs et al. v.
The People, 124 Ill., 399, that where a conspiracy is formed
with a particular object in view, prior to a time when the
statute of limitations begins to run, and an overt act is done
within the period, then it is proper to introduce evidence
showing the formation of the conspiracy. But it is also
the law that the object of a conspiracy must be proved as
laid in the indictment, and that in order to show conspiracy
something more is required than proof of a mere passive
cognizance of an illegal action intended or desired by others;
there must be something showing active participation of some
kind by the parties charged. Evans v. The People, 90 Ill.,
384. The People, therefore, in the case at bar, could not
even plausibly contend that the statements of Mangan in
first suggesting the election of an executive board, made at
least six months before the board was brought into being by
the Union, and at least eighteen months before the strikes
took place at the Western Electric and Stromberg-Carlson
plants, which were the proximate occasion for the incidents
that led to this prosecution, nor the statements of Jacob
Johnson made to Thumann in the latter's shop, out of the
presence of all the other defendants, three or four months
before the actual inauguration of the board, proved the

board to be inherently criminal in its designs or by itself established complicity of the other members of the board, when formed, in any criminal conspiracy, much less a conspiracy to do the particular criminal acts described in this, indictment.

But the People argue that such inherently criminal character and such complicity are shown by the evidence of Thumann in connection with further evidence of overt acts during the strikes in question by those defendants who were members of the board. It is plain, however, that this evidence, to be in any way effective against Hoppe and Christie, as well as against Maloney and Gus Johnson, must in some way show that either they personally or the board as a board, or at the least, members of the board as such members, participated in the overt acts in furtherance of the conspiracy charged. Otherwise the utterances of Jacob Johnson and Mangan alone would be condemning the other members of the board.

We do not find in the record any sufficient evidence of the required conditions. Neither as to them personally, nor as to the executive board as a board, nor as to any member of the executive board in his capacity as a member of such board or as representing such board, do we think there is in the record any such clear and satisfactory evidence of guilt as the criminal law requires to make a judgment of conviction justifiable against persons whose alleged connection with the conspiracy must rest solely on their membership of this board. The evidence that is found there bearing on this matter was furnished by Charles R. Smoot and Albert Fridley. These also were the witnesses who furnished seriously incriminating evidence against Jacob E. Johnson and William Mangan, tending to show said Johnson and Mangan to be, aside from any connection or membership they had in the executive board in question, conspiring to injure physically certain persons. Smoot was a brass molder who came to Chicago from St. Louis in September, 1901, and could get no work in his trade. He went to work as a laborer on odd jobs, but in November, 1901, he ob-

tained a molder's job at the William Holland Brass Foundry, which employed only a few molders (not more than five, Smoot says), and there he met Thumann, who was working there, and Albert Fridley and one Ray Judd and one Clay Bassa, who were also molders. Smoot and all of these men and Klenzendorf, who worked with them at Holland's, seem to have gone with Thumann from the Holland foundry to the Western Electric Company in May, 1902, Thumann telling them, he says, that there was a job open there— if anybody wanted it, they could go down and get it. This is the matter to which Klenzendorf testified Thumann referred in a conversation with him and others in a saloon, after the grand jury investigation, by saying: "I am a detective and no foreman. I knew this case was coming up before I hired you fellows. All I wanted was witnesses." This remark was however denied by Thumann, and in his denial he was corroborated. Thumann was, however, as before stated, a detective in the employ of two detective agencies, and had been so for at least a year and a half when he became acquainted with Smoot at Holland's in November, 1901. Smoot says that he did not know that Thumann was a detective when he worked with him, and that Thumann never engaged him for any purpose, "no more than to ask me to go to work at the Western Electric Company." But he says that he (Smoot) wasn't making money enough to suit him, and that he tried the latter part of May, 1902, to join the Union, Local 83; that his application was delayed, and that while still working for Holland's he told Thumann that he (Smoot) had to get into the Union or get a job elsewhere, that he couldn't stay at Holland's—a statement by which he says he "didn't mean nothing." He says also that early in July, 1902, he received a letter addressed to his house, which stated that a Mr. Parks wished to see him at McCoy's Hotel; that the letter asked him if he wanted a situation, and that he went to McCoy's Hotel in consequence and met Mr. Parks. Mr. Parks was connected with the management of the Manufacturers' Information Bureau, one of the detective agencies of which Thumann was an em-

ployee. Smoot says Parks didn't hire him to work that morning he first saw him. "He had to look me up to see what calibre I was made of. He told me what he wanted me to do. He said he wanted to see who it was that was doing this slugging. He wouldn't have a man, he wouldn't give me a job if he thought I would soon be scared away." A week later, he says, he met Parks again by appointment in a saloon across from the Great Northern Hotel; that Parks told him that his references were satisfactory and hired him; that he was to find out, if possible, who did the slugging at any shop at any strike, and was to get, if he proved satisfactory after thirty days' trial, $70 a month; that he then received some money from Parks, he didn't remember how much, and was told to go to New York on a ticket which was given him; that he went to New York about July 25, and afterward to Pittsburgh; that from that time until the day of the trial in 1903—six months—he had received $70 a month from Parks; that this sum he was guaranteed, but he was supposed to work at his trade some in the shop where he might be placed, and to receive this guaranteed pay; that he came back to Chicago about December 7, 1903 (the indictment in which he was a defendant had been returned August 1, 1902, five days after he left Chicago, and he had been ever since in the employ of the detective agency), and was immediately arrested and placed in jail, from which he had come to plead guilty on January 6, 1903. He was released on bail January 13th and testified on the 14th. He said that between his first interview with Parks in July and the one in which he was definitely hired as a detective agent by him, a week later in the same month, while Parks "was looking him up to see what calibre he was made of," he went to Jacob Johnson who was the business agent of Local 83, and "hired out to him"; that Johnson told him in effect that he, Johnson, wanted him to slug Henry Thumann and Clay Bassa, gave him $25 in bills, and told him to do the job good; that he told Parks what Johnson had hired him to do; that he intended to do the slugging but changed his mind after considering it was a serious job; that there-

fore meeting Bassa after that coming out of the Western Electric Works in the evening with Fridley, he, "pushed him to see what he would say, and told him to stay out of the shop," but that he "made them believe" "down at the hall" "that he 'took' him" (Bassa). "They only wanted," he says, "to give him," Smoot, "five dollars" "because they said I only gave him five dollars' worth; that I didn't do twenty-five dollars' worth, only five dollars." Smoot says that afterwards, before he left town on Parks' business, he met Johnson several times, and on one occasion there was a quarrel between him on one side and Johnson and a bar-keeper at Bricklayers' Hall, named Olson, on the other, about the repayment of twenty dollars, that he had spent the money and couldn't pay it back; that he was, however, looking for Johnson one night in order to pay him back this money and couldn't find him.

There is nothing in Smoot's testimony implicating any member of the executive board other than Jacob Johnson with this proposed slugging of Thumann and Bassa, and while it would appear from the testimony that it was as "business agent" of the Union that Johnson was acting, there isn't any intimation of anything leading him to such a plot except his own personal wish "to win the strike" and please the Union. The statement that "they," whoever Smoot might have meant by that word, "down at the hall only wanted to give him five dollars instead of twenty-five dollars," is too vague to identify anybody with the transaction.

Smoot testified, "This is not a detective job—the only thing is between Johnson and myself. I tried to do everything for him and he shoved me down, then he gave me twenty-five dollars, and so in July he drove me to despair, and I says, 'Johnson, if you don't give me a job I will have to look elsewhere,' and I did. I had to take some kind of a job in a big city like this, and then Mr. Parks said to me, 'If you will stick by me, I will stick by you,' and he has stuck by me and I by him. I have taken this job I now have in order to get information to put Johnson in jail, because I think he deserves it."

Johnson v. The People.

Smoot's story as here outlined has some obvious inherent improbabilities.    It certainly is not matter to be overlooked in considering it that it is a fair inference that Thumann had recommended him to Parks as a suitable detective employee, and that Smoot was very desirous of recommending himself for the employment at the time he says he undertook for Johnson's bribe to commit a crime.    At the time when he made the technical assault on Bassa as a pretense of performing his undertaking, it would seem, according to his own dates, that the engagement had been concluded.    It is also to be noted that his arrest, stay in jail and plea of guilty were all while in receipt of his monthly salary from the detective agency of which he was still an employee when testifying.    That his testimony under these circumstances is subject to strong suspicion, if it is contradicted, is very evident.    This is a matter perhaps more important when we come to consider the conviction of Jacob Johnson, than in connection with that of the others, for Smoot does not give any testimony which incriminates them.    But it is to be noted here, that it would plainly be unjust and dangerous seriously to regard the assault on Bassa by this witness, under the circumstances before detailed, as an overt act, tending to prove the existence of a conspiracy on the part of the members of the executive board of the Union.    To hold it so would be to put a premium upon perjury.    To make it possible for a detective decoy to hire himself out to one of a committee or board to do a criminal act, and then to take the stand and by swearing that he did it, involve the whole committee in a condemnation for a conspiracy proven to exist by that act, would be to widen the already dangerous latitude of evidence allowable in conspiracy trials beyond reason.    It is not the law.    U. S. v. Kane, 23 Fed., 751; Saunders v. People, 38 Mich., 218; Connor v. People, 18 Colo., 373.

On the only other witness relied on, to establish the guilt of the executive committee or board as such, Albert Fridley, the counsel for the People bestows compliments which seem to us ill deserved, if the words "courage and force of char-

acter" are used in any manner in a eulogistic sense.   On
the contrary it cannot be controverted that if Fridley's story
is true, he has confessed himself to be, as counsel for de-
fendants urges, a very base and dangerous character.   His
story of his connection with the affairs involved in this
prosecution is this:   When the lockout resulting from the
difficulty over the closed shop agreement occurred at the
Stromberg-Carlson Company on January 31, 1902, Fridley
was one of the half dozen brass molders who left its employ.
He was at that time a member of a woodworkers' union,
but was not a member of the Brass Molders' Union.

It would appear that Jacob Johnson, the business agent
of the Brass Molders' Local, met these locked out brass mold-
ers, by appointment or otherwise, immediately afterward—
on the same day—in the vicinity of the plant, and invited
them to come to a meeting of the joint executive board of
four affiliated trades, the molders, polishers, finishers and
chandelier makers, at 132 Fifth avenue (Bricklayers' Hall),
the following Sunday afternoon.   Fridley there, with most
of the others, formally made application to join the Union,
signing a written application, and paying a preliminary initi-
ation fee of a dollar the next day.   At that time Johnson
told him and others to go out on "picket duty" at the Strom-
berg-Carlson Company, and promised them pay for this
work, he says, at an increasing scale to the third week, for
which, and thereafter weekly, it was to be nine dollars.
Fridley remained on that "picket duty" until near May 1,
1902, about three months.   But during this time he quar-
reled with Johnson about the pay.   He says Johnson re-
fused to pay him anything for the first two weeks, and on
his remonstrating Johnson told him he was "a born scab,"
and "to go back to work and they would take care of him."
He says he went up to the executive board and complained
and then received for two or three weeks six dollars a week
from Johnson, and afterwards seven dollars and a half, al-
though he had been promised nine.   He also seems to have
had differences with Johnson about the hours he was to keep
in the "picketing" and about a "permit" to go to work in a

"Union" shop, and "in fact" he says, "I was all the time offended with Jacob Johnson," and "had several tiffs or spats with him," at which times Johnson called him "a scab and a liar." He said upon cross-examination that he was while involved in a transaction hereafter detailed, which happened while he was a picket, "getting even with Johnson," and was, while he was testifying, "trying to get even with him," and blamed the executive board for having him expelled from the Woodworkers' Union. With apparent seriousness he admitted that he would willingly have put dynamite into the metal at Stromberg-Carlson's, as that was "what he was getting paid for," and "anything he was wanted to do he would have done." He says he himself suggested the use of a dynamite bomb. It was not devotion to the Union that prompted this willingness to commit crime, apparently, for he says that he would just as lieve have worked as to go on "picket duty"; that he told Johnson that he had all kinds of misfortunes, among them the loss of his wife, and asked for money from the Union for her funeral expenses, although the death of the wife whom he had buried had occurred more than two years before, and he had, in the meanwhile, more than a year before, married again. He also testified that for the purpose of getting money from the Union he untruthfully represented that he had bribed a watchman and should be repaid, justifying himself "because he wasn't getting enough money" from the Union.

In the latter part of April, 1902, Fridley stopped picketing and went to work at Holland's, where Thumann and Smoot were working, and with them went on May 14, 1902, to the Western Electric to work, and with them appeared before the grand jury as a witness, when this indictment was obtained August 1, 1902. When testifying, he was still working for the Western Electric Company, who had, between the time of the indictment and the trial of this cause, sent him to Minneapolis and St. Paul, his "home," he says, where they procured him a job, and to which they paid his fare. He testified, however, that Thumann "did not make a detective out of him," nor tell him that he was a detective

himself, that he did not know that Thumann and Smoot were detectives, and that he never got any pay as a detective agent, but that he had told to Thumann some parts of the story he testified to on the stand before they went together from Holland's to the Western Electric Company. Fridley's story of that which happened while he was a picket is the testimony on which the State mainly relies to establish the criminal co-operation of the members of the executive board in a conspiracy "to injure the person of each and every individual then working as brass molders for the Stromberg-Carlson Company not a member of Brass Molders' Local Union Number Eighty-three," or "to injure the person of any such individual working for the Western Electric Company," or "to injure the person of Henry Thumann, Clay Bassa, Fred Smith and Roebling," or to do some two or all of these things. That story, in addition to that which has been heretofore indicated, is this: When he went at Jacob Johnson's invitation to Bricklayers' Hall on February 2, 1902, the Sunday afternoon after the Stromberg-Carlson lockout, he first met Gus Johnson, Hoppe and Mangan, as well as Jacob E. Johnson. Besides these men there were "lots of people" there in the same room. He thinks Jacob Johnson and Hoppe talked with him. Jacob Johnson said he didn't want the men who had left or been locked out to go back to the Stromberg-Carlson Company, and asked Fridley whether he was willing to join the Union. Fridley assented and wrote out an application for admission, paying an initiation fee of a dollar the next day to Jacob Johnson. It was then that Johnson, Fridley says, put him and three or four others on "picket" at the Stromberg-Carlson shops. Fridley says the instructions given to him were to stay in the vicinity of the shops each day from six to six, and if anybody that looked like a molder came, to keep him out by telling him there was a strike going on, and that he was "taking bread and butter away from us fellows." Asked on cross-examination if he was told to threaten anybody, he answered, "No, they didn't say so, but they told me to keep them away from there the best I could." Fridley says that

Johnson v. The People.

when he first became a picket he "didn't do much," that he laid around watching the wagons, and followed the wagons to see from what foundries the castings came, so they could shut the work off.    Then on Wednesday and Saturday nights, he says, he would report to the executive board. There is rather a vagueness or variation, not unnatural, in his testimony when specifically asked as to who were present in the various meetings of the executive board to which he reported, and he sometimes speaks of those present as "the whole push," and sometimes as "the same fellows except Maloney," by which he apparently means all the defendants on trial except Maloney.    But near the beginning of his testimony, after saying that he told the executive board of his doings every Wednesday and Saturday night, he was asked, "Do you remember who were present when you reported to the executive board at night?"    (Neither question nor context having reference to any particular night.) His answer was that both Johnsons (Gus and Jacob), Hoppe, Mangan, Christie and Forbes were there, and afterward he explicitly said that all the defendants on trial but Maloney were present on all occasions when he made his reports, and that Maloney was around in the saloons with the board members and himself.    He says he followed five or six wagons and that at these meetings of the board he would tell them where the wagons came from, and Jacob Johnson would go to foundries and stop the work.    He also reported that he would ask workmen, if they came along, if they were molders, and if they said yes, would tell them "There is a strike going on there, and they didn't like to have them go"; that "in a friendly way he would say to these men," "if they got cranky," "You know what a strike is, it generally turns to trouble and somebody gets hurt."    Jacob Johnson told him to find out where the men on the wagons lived if possible. Fridley told the men he talked with that if there were any molders that wanted to work, Jacob Johnson would get them work at three dollars a day.    He says when there were any interesting cases he would report to the executive meeting, and that he reported at one time that there were seven men

had gone to work at the shop.   At some time after his quarrel with Johnson about pay, Fridley went through the shop with the watchman and got hold of the books and took the names of the non-union brass molders working there.   He says that he proposed this of his own accord, and Jacob Johnson said to him, "If you can, I wish you would."

It was at this time that he tried to get three dollars, and received, he says, a dollar and a half from Gus Johnson for a bribe, which he untruthfully reported he had given to the watchman, and it was also when he was proposing to make this felonious trespass in the Stromberg-Carlson plant, that in reply to an alleged remark of Mangan's, that "if a fellow had a gun and shot down into the Stromberg-Carlson basement to scare those fellows a little bit, it might help some," he (Fridley) told Mangan that if he (Mangan) had a dynamite bomb he should give it to him (Fridley) and he would put it in.   He says Mangan did not say anything about putting it in, but that once Mangan did tell him they ought to have something to put in the metal to blow the men's heads off.

The morning after getting the names Fridley gave them on a slip of paper to Johnson in the vicinity of the shop. Four nights after this Fridley went to the executive board and Jacob Johnson was there with the slip, but Fridley says that Johnson did not say anything about it when he (Fridley) was there.   "They would not let me hear," he says, "because when I got there they was talking about me."   But he says all the defendants on trial, including Maloney, were in the saloon when Gus Johnson gave him the dollar and a half.   Fridley testifies, in another connection, that the executive board at their meetings never took him into their confidence, but that after he had made his reports he was shut out.

After he had been a picket for over two months, he testifies he was one Monday going to dinner and met Jacob Johnson, who upbraided him for not being at the Stromberg-Carlson plant.   Johnson wanted him to be there at all times between six and six, so that in case he, Johnson, should send

anybody around, Fridley could point out a certain man named Metz, concerning whose employment in charge of the Brass Molders at Stromberg's, Jacob Johnson and Mangan had previously asked Fridley. Nothing further was said then, according to Fridley's testimony, but Johnson told him to be at the Bricklayers' Hall at four o'clock that afternoon. What happened there is, in Fridley's words, slightly condensed, as follows:

"We had a beer over the bar there." (The bar or saloon was on a lower floor and the Union meeting room on a floor above.) "Then the bell rang and Jake Johnson winked at me that I should come out. I went into the wine room. There were two fellows in there. One was named Andrew Anderson. Jake Johnson ordered a beer, then we drank that. Then Jake says, 'Here is them fellows, I want you to point out this crooked nose Metz to them,' so he could get next to this Metz. I says, 'All right.' He says, 'You fellows can make an appointment to meet.' Anderson named Frank Bros.' saloon. I says, 'All right.' We had another drink and then Johnson asked if I had any car fare. I told him no. He paid for the drinks and gave the fellows sixty-five cents. He said, 'That ought to do you for car fare.' There were three of us. Then he winked at the bar tender and the bar tender came out with two revolvers and two billies and handed them to Anderson. Anderson handed a revolver and billy to his partner. Then Jacob Johnson told Anderson I was going to point this fellow out to him, and said, 'Do away with him.' We made an appointment to meet at Frank Bros.' saloon at seven o'clock."

Fridley testifies that he met Anderson and his friend or partner, whose name he had never inquired, at Frank's saloon at the appointed time, and after a drink there he (Fridley) went again to the Bricklayers' saloon, and changed his hat with one Burns, the saloon-keeper there, then rejoined Anderson and his friend at Frank's, and went from there with them to one McDonald's saloon near the Stromberg-Carlson plant. There Fridley left his companions and went to the Stromberg-Carlson shops to see if Metz was then

working there. He was to report to Anderson and his friend. Going into an alley by the works he saw Metz through the open windows, working around the furnace, but he says, "I went back to Anderson and told him Metz wasn't working."

He proceeded: "I ain't got nerve enough to see anybody like that way. I thought there was going to be a murder or something. I told him (Anderson) he (Metz) wasn't working. Anderson said, 'That's too bad—another twenty-five dollars gone.' I said, 'We can get the twenty-five dollars anyway.' He says, 'How?' I says, 'We will tell Johnson we got them.' He says, 'That is a good scheme, we will do that, and if we can make it work we will divide the twenty-five dollars up.' He says, 'You stick, if Johnson comes and asks you he will believe you; you should tell him that we have got him, that I seen him rolling around the streets in under the elevated line, then we would get the twenty-five dollars. We have got to meet Johnson at eleven o'clock at the Bricklayers' saloon.' Jacob Johnson came to me in the morning before he went to the Bricklayers. He asked me if they got this man Metz. I says, 'That is all right.' He said, 'Did you see anything?' I says, 'I was on the corner, as soon as he hit him I digged out so I wouldn't be found there or get caught.' Johnson said, 'That is all right.' I met Anderson at one o'clock at Frank Brothers' saloon, and he just said he got twenty-five dollars from Jacob Johnson. I got five dollars from Anderson. He says, 'Here is five dollars, we spent pretty near the rest. I ain't got much left myself.' "

Following this testimony of Fridley's is a statement by him which is the strongest evidence adduced by the State against Hoppe and Christie of participation in a conspiracy such as is described in the first seven counts of the indictment in this cause.

In his direct examination Fridley testifies: "I went to the executive meeting after that on Saturday night—the last time I was there—and I told Mangan them fellows in the Union was doing me dirt, working right along so they

wouldn't take me in the Union." "Q. Did you ever talk with the men on this Executive Board about this money that was paid to Anderson?" "A. Yes, sir." "Q. What did you say?" "A. I didn't tell him that Anderson gave me five dollars of the twenty-five dollars." "Q. Did you ever talk with them about the crooked nose man?" "A. Yes, sir." "Q. What did you say about the crooked nose man?" "A. I told Mr. Mangan—asked him and Johnson—Mangan and Johnson asked me if they had got him all right. I says, 'Yes.'" "Q. Who was present at that time?" "A. The same fellows, all but Maloney." "Q. Can you remember anything that any of them said about this man at that time?" "A. What Mangan says?" "Q. If any one said anything —Mangan or anyone else?" "A. They didn't let me hear anything—they put me out and they had a talk." "Q. While you were there?" "A. They asked me if they got him good, and I says, 'Yes.'" "Q. Who asked you that?" "A. Mangan." "Q. And were they all present when you said that?" "A. Yes, they was all there." "Q. All except Maloney?" "A. All except Maloney."

In cross-examination he said that he thought the expedition against Metz was on Monday, and that he went to the next executive board meeting after that, on Wednesday; then correcting himself, he said, "No, I think we had an executive meeting right after—after that—after we were supposed to act. I went up to the meeting and told them about it." "Q. Who was it asked you if you got them good?" "A. Mangan. He says, 'Are you sure he is done good?' and I told him, 'Sure he is.'" "Q. Did you describe the affair to him?" "A. Yes. * * * I told him I stood on the corner of Clinton and Jackson when Metz came out and I pointed him out to Anderson, and Anderson followed him right up, under the elevated line, and I see them flying around in the street and then I ducked. Mangan said that was all right. He asked if he was back at work, and I told him no, I didn't see him." * * * "Q. You were pretty sore at those fellows at that time?" "A. They were doing me." "Q. And they were sore at you and you at

them?" "A. Yes." "Q. And yet they hired you to do this line of work?" "A. Yes, sir."

That tacit acquiescence or approval of a report of violence of the kind involved here may be competent evidence to show, in connection with other circumstances, a conspiracy on the part of those to whom the report is made to effect the violence, is undeniable. It is equally undeniable, however, that the answers we have recited obtained from a by no means unwilling or reluctant witness for the prosecution, are, as to the defendants Hoppe and Christie, against whom nothing else practically but this testimony and their membership in the executive committee can be urged, insufficient to banish such serious and well founded doubt of their guilt as requires us to reverse their conviction.

It is begging the question to argue, as do counsel for the People, that the participation of these two men in the work of the pickets, so long as that work was the mere interception, interviewing and persuasion or dissuasion of applicants for work, or the ascertainment of the names and addresses of the workmen who obtained employment, or of the sources of the material supplied to the shops, is proof of their being conspirators to do personal murderous injury to certain men. It shows they were interested in the work which the executive committee as a body had taken on itself; it does not, however, show that work to have been the slugging of non-union men. The story that Fridley told of his report to the committee in the presence of Hoppe and Christie, and its reception by that committee is competent and to the point, but it is not, we think, sufficient to prove beyond a reasonable doubt the guilt which it seeks to establish.

"In order to show conspiracy," says the Supreme Court in Evans v. The People, 90 Ill., 384, "something more than proof of a mere passive cognizance of fraudulent or illegal action of others is necessary. There must be something showing active participation of some kind by the parties charged." At all events, when testimony of this character from witnesses like Thumann, Smoot and Fridley, is met, as it is in this case, by the explicit denials, general and specific,

of every incriminating circumstance by all the persons accused by them, and each of such accused persons is sworn by reputable citizens to be of a good reputation as a peaceable and law-abiding man, and the purpose of the formation of the executive board is fully and naturally explained in a manner consistent with its innocent intent, there is certainly left in our minds a belief that on the whole record this conviction ought not on the merits to stand against the plaintiffs in error Hoppe and Christie. The jury thought the evidence was not sufficient to convict Maloney and Gus Johnson. It was no more so to convict Hoppe and Christie, between whose position and that of Gus Johnson at least no reasonable inference of difference can be drawn from this record. That the jury acquitted Maloney and Gus Johnson and convicted Hoppe and Christie, seems in itself to us to indicate that the cause did not receive at their hands calm and dispassionate judgment. It is rather suggestive of passion or prejudice, which the ofttimes arrogant and unwarrantable methods of labor unions, even when they fall short of the criminality alleged in this indictment, tend naturally to produce in the minds of good citizens.

The case against Jacob Johnson and Mangan stands on a different footing. We have hereinbefore detailed the principal evidence which we deem competent and admissible against them. If it is to be believed, it indubitably establishes against Johnson, and perhaps against Mangan, murderous designs, and a conspiracy on their part with Smoot and Fridley. But the denial by themselves of the alleged incidents sworn to by Smoot and Fridley is fortified by the denial of other witnesses who were called for the defense, and who were involved by the testimony. Thus the saloonkeeper and his bartender at Bricklayers' Hall, explicitly deny all the circumstances which Fridley recited concerning the inception there of the proposed assault on Metz; and Olson, whom Smoot represented as joining in an assault on him by Jacob Johnson and others, while admitting his personal quarrel with and assault on Smoot, denies that Johnson had any part in it or responsibility for it. All of the persons con-

nected with the executive committee of the Union and all its
officers deny and disclaim any instructions, encouragement
or condonation of violence in any form.    Counsel for de-
fendant, not without reason, argue that Fridley's testimony
concerning the projected assault on Metz, contains some re-
markable and suspicious characteristics, and that the expla-
nation of Metz's name not appearing in the indictment as one
of the persons conspired against is difficult to surmise, if
Fridley's information to the prosecution had not from time
to time changed.

The defense of Johnson and Mangan was plainly predi-
cated on the existence of a plot by Thumann, Smoot and
Fridley as the agents of detective bureaus eager to accredit
themselves with their employers, and from personal mo-
tives of revenge and hatred, desirous of convicting, by per-
jured and manufactured testimony, the plaintiffs in error.
It is not too much to say that color for this theory is
not altogether wanting in the record, but so far as Johnson
and Mangan are concerned, we might well, in view of the
importance we must properly attach to the verdict of the
jury, despite its inconsistency which we have pointed out,
hesitate to reverse the judgment on the weight of the evidence
alone.    But we cannot, considering this record and the sus-
picious and unsatisfactory character of much of the evidence
for the prosecution, allow the conviction to stand if evidence,
improper, even under the very liberal and necessarily dan-
gerous latitude allowed to conspiracy cases, was admitted
for the prosecution, or if competent evidence for the defense
was excluded.

Both these errors, we are obliged to say, we think were
committed.    The most pronounced and injurious error we
deem to be the admission of testimony regarding the shoot-
ing of Lars Hanson.    Lars Hanson was not a brass molder
at all.    Nor had he ever been one.    Nor was he even a
metal polisher.    He was in the employ of the Western Elec-
tric Company in an entirely different department.    He was
shot by some person never apparently identified in any crimi-
nal prosecution for that crime, nor in any way, except by

Fridley's statement that Andrew Anderson confessed to him that he had done it. It does not appear in any other way whatever that the Brass Molders or any person connected with them had anything to do with it. Hanson was walking at the time with a foreman in the Western Electric Company. There were no other workmen with them, but many people behind and in front of them, thousands of whom, he says, left the shop at the same time he did. The testimony of Fridley that Jacob Johnson, whom he told about the shooting the next morning, "knew about it," which counsel for the State quote, appears plainly in the record to be Fridley's unsupported conclusion. Even the language which Fridley attributes to Johnson falls far short of any such admission. We do not see upon what theory of the law the evidence of Selberg and of Hanson as to this shooting was admitted. It was plainly injurious, and in connection with the testimony of Fridley as to his conversation with Johnson concerning it, eminently likely to excite the passions and prejudices of the jury. The objection was made by counsel for the defendants, that the evidence was inadmissible because the indictment was only for conspiracy to do injury to brass molders. The counsel for the State is shown by the record to have replied, "Yes, but suppose it was to do injury to any man that worked in that department or that shop?" We do not see what answer can be made to the obvious reply that the supposition is contrary to the fact, and that the evidence, to be competent and relevant, must relate to the conspiracy charged in the indictment. Commonwealth v. Harley, 48 Mass., 506.

Fridley testified that he told Johnson that Anderson was paid money for this shooting by one Becker, not a brass molder nor a member of their Union. Even if it is assumed that a defendant to an indictment for conspiracy to commit one crime was in another conspiracy with some other person to commit another crime, evidence of the commission of that second crime is not admissible upon the indictment against the alleged co-conspirators of such defendant to commit

the first crime.  Swan v. Commonwealth, 104 Pa. St., 218;
People v. Parker, 67 Mich., 222.

In this case there is nothing tangible to connect any one
of the defendants, except Anderson, who was never arrested,
with the shooting of Hanson.

There were other lesser errors in the admission of evi-
dence.  For example, Fridley was allowed to testify as to
the striking by Anderson of a metal polisher in the neigh-
borhood of the Stromberg-Carlson shop—a matter objection-
able on the same ground as the shooting of Hanson.

We have indicated that in our opinion there is an absence
of proof that the executive board of the Brass Molders' Union
was originally formed for the purpose of the criminal con-
spiracy alleged in the indictment.  It was, however, urged
by the State that this was the case.  We think, therefore, the
offered testimony of Lynch as to the reason for the institution
of an executive board for each Local, should have been ad-
mitted.

We think, too, that if the trial court allowed Jacob John-
son to be cross-examined concerning the whereabouts of Ford,
a member of the executive committee, over the objection of
defendants, but with an assurance that they would be al-
lowed later to explain, it was error to strike out an explana-
tion of Ford's non-appearance when offered by Mangan.
This, however, was but a minor error, probably not materi-
ally injurious, and consequently not ground for reversal.

Our conclusion, however, after a careful study of the
whole record, is that there have been, as to all the defend-
ants, violations of that careful regard which should pre-emi-
nently, in conspiracy cases, be paid to the materiality and
admissibility of evidence, and that the errors in that regard
were materially injurious to the plaintiffs in error.  We
therefore reverse all and each of the judgments of convic-
tion, and remand the cause to the Criminal Court.

*Reversed and remanded.*