DETERMINED IN THE

## . FIRST DISTRICT

OF THE

# APPELLATE COURTS OF ILLINOIS

## DURING THE YEAR 1912.

---

The People of the State of Illinois, Defendant in Error, v. F. A. Pouchot and M. J. Boyle, Plaintiffs in Error.

### Gen. No. 16,393.

1. CRIMINAL LAW—*abatement of writ of error.* In a criminal case, where the death of one of defendants is shown after joinder in error, a judgment is entered that the writ of error abate as to such defendant.

2. CONSPIRACY—*evidence.* As soon as there is a union of wills for an unlawful purpose a conspiracy is perfected, and any acts or declarations in furtherance of this purpose are the acts of all and evidence against all.

3. CONSPIRACY—*circumstantial evidence.* A conspiracy may be proved by circumstantial evidence.

4. CONSPIRACY—*agreement to concur not necessary.* It is not necessary to prove an agreement to concur in order to establish a conspiracy to obtain money by false pretenses.

5. CONSPIRACY—*obtaining money by false pretense.* A conspiracy to obtain money by false pretenses, under section 46 of the Criminal Code, may be proved although money was not obtained.

6. CRIMINAL LAW—*declarations of conspirator part of res gestae.* Where one charged with conspiracy makes declarations to another, who at that time is encouraging him in his designs, it is improper to exclude them as self-serving declarations, since they are a part of *res gestae.*

7. CRIMINAL LAW—*exclusion of evidence.* It is not a reversible error to exclude proper testimony, where it would not have had a

tendency to change the verdict and the court was not informed by counsel as to what they intended to prove.

8. CONSPIRACY—*one person cannot be found guilty.* Where several persons are charged with conspiracy, one cannot be convicted unless one or more others are also proved guilty.

9. CRIMINAL LAW—*similar offenses admissible to prove intent.* Evidence of similar offenses is admissible to prove intent, where labor leaders are charged with conspiracy to obtain money under false pretenses in promising to settle a strike, there being doubt as to the intent of some of the defendants.

10. CRIMINAL LAW—*evidence of other offenses.* Evidence of similar offenses committed by two of three parties charged with conspiracy should be expressly limited by the court to the parties concerned, if so requested by the party not concerned.

11. CONSPIRACY—*to obtain money by false pretenses.* Where the evidence shows that defendants, leaders of labor organizations, falsely represented that they had authority to settle a strike and collect money as a fine from the owner of a building then in construction, who was thereby deceived and induced to pay the money, a conspiracy to obtain money by false pretenses, rather than by threats, is established.

Error to the Criminal Court of Cook county; the HON. WILLIAM H. McSURELY, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1910. Affirmed. Opinion filed October 16, 1912.

DAVID K. TONE, for plaintiffs in error.

JOHN E. W. WAYMAN, for defendant in error; BENEDICT J. SHORT, of counsel.

MR. PRESIDING JUSTICE DUNCAN delivered the opinion of the court.

The plaintiffs in error, F. A. Pouchot and M. J. Boyle and Martin B. Madden, were indicted in the Criminal Court of Cook County for conspiracy. Upon trial they were all severally found guilty by the jury "in manner and form as charged in the indictment," and their penalty or fine fixed at $500 each, and the Court entered judgment and sentence against each one of them accordingly.

Since the joinder in error in this Court, the death of Martin B. Madden has been suggested on the rec-

ord, and judgment has been entered in this court that the writ of error abate as to said Madden. O'Sullivan v. People, 144 Ill. 604; United States v. Mitchell, 163 Fed. 1014.

Of the eight counts of the indictment upon which plaintiffs in error and Madden were tried the first, second, fifth, seventh and eighth charged them with a conspiracy to obtain money from the Joseph Klicka Company, a corporation, by means of false pretenses. All of said counts, except the seventh, charged that the said company was the owner of a certain building in process of construction, upon which were employed a large number of mechanics and workmen; that plaintiffs in error and Madden unlawfully, willfully and maliciously advised and procured certain of said mechanics and workmen to cease their work upon said building and to go out on "a strike," and while they were so out on a strike, plaintiffs in error willfully, unlawfully and maliciously conspired to obtain and did obtain from said company a large sum of money, to-wit, $1,000, by means of certain false pretenses, to-wit, that they had authority and power to settle the strike for money; that they had control and influence and power and authority to order and compel the said workmen and mechanics so striking to resume their work, provided plaintiffs in error were paid money; and that plaintiffs in error well knew they had no such authority, power, control or influence, etc. The seventh count charged, in general words, a conspiracy of plaintiffs in error to obtain the sum of $1,000 of said company by means of false pretenses without specifying such pretenses. The third, fourth and sixth counts are common-law counts and charged plaintiffs in error with a conspiracy to extort $1,000 in money from the Joseph Klicka Company by threatening to continue the strike unless said money was paid, etc.

The evidence in this case discloses that in the month of September, 1908, the Joseph Klicka Company was constructing a factory building at 20th street and

California avenue, Chicago. Different parts of the work were by the company let to different contractors. D. L. Frasier was the superintendent of construction of this building for the company. Emil Klicka was its president. Plaintiffs in error were officers and agents of various labor unions. Each class of workmen were organized into unions. The various unions were affiliated with the central organization called The Associated Building Trades. They were again organized into another central body, called the Board of Business Agents, which was made up of the business agents of the various locals. At the times in question Martin B. Madden was the business agent of the Steamfitters' Union and the president of the Associated Building Trades. Pouchot was a member of the Sheet Metal Workers and the business agent of that union. Boyle was a member of the Electrical Workers' Union and the business agent of his union. In the latter part of September, 1908, plaintiffs in error and Madden called a strike of the various union workmen on said building. At this time Atkins, Young and Allen, steamfitting contractors, represented by a Mr. Ott who usually employed non-union men, had a contract on said building to furnish steam heating, but had not then done any work on the building. Cyclone Blow Pipe Company, a sheet metal concern, which at times installed non-union material with union men, also had a contract on said building.

It is first contended by plaintiffs in error, Pouchot and Boyle, that the evidence fails to show that they had anything to do with extorting, or conspiring to extort, the said $1,000 from the Klicka Company, and that the evidence does prove that the strike was called at the plant of the Joseph Klicka Company for the sole purpose by them of preventing the employment of non-union labor on said plant. Darrell Frasier, superintendent of construction at said building, testified that there were between twenty and fifty men work-

People v. Pouchot et al., 174 Ill. App. 1.

ing on the building on the day of the strike, and that there were no electrical workers on it that day; that by instructions from Postle & Mahler, the architects, he had conversations with Boyle and Madden in November, 1908, at Powers & Gilbert's saloon on Clark street; that he met Mr. Boyle at that saloon and that Boyle introduced him to Madden after he had told Boyle that he represented the owner and the architects of the said building; that Madden asked him who he was and what he wanted and that he told Madden he wanted to know the nature and cause of the strike; that Madden replied: "I think I know, all right, the cause of it. There is one man we want to get and that is that man Ott, as he has been in the habit of doing work around the city, where there has been no union represented, and we have him out there. We have got him now. You are not the man we want to see. We want to see the owner. Who is the owner, Mr. Klicka? Will you see him?"; that he, witness, replied that he would have Mr. Klicka at Powers & Gilbert's saloon next morning, and that he then went back and saw Klicka; that he went to Powers & Gilbert's at 10 o'clock next morning, the hour of the engagement, and that Boyle came in and asked him where Klicka was, and that he told Boyle he could have him there in five minutes; that he brought Klicka to the saloon and that Boyle escorted them into a little office at the end of the bar, and Klicka was introduced to Madden and Boyle; that after the introduction Boyle informed witness that his presence was no longer required in there, and that he stepped out; that in a minute or so Madden stepped out and that he and Madden talked about things in general, and that in about two minutes Boyle came out of the office and took Madden off to one side and called another gentleman to whom he was introduced as Pouchot; that they, plaintiffs in error, and Madden, then held a conversation after which Boyle returned to the office to Klicka; that shortly Klicka came out, and he and

witness went to the bank and that Klicka drew out $200 and then they went back to the saloon; that Klicka went into the office again and in a minute or so came out and said to Madden, "This is a damn shame and a damn outrage," and that Madden replied, "I don't know anything about your business." The witness then further testified that the strike lasted about seven weeks, and that prior thereto he had never had any complaint from any of the workmen; and on cross-examination said that the contract for the blow piping had not been let when the men quit work, and that Ott had no men at work there then; that when he went to the saloon with Klicka, Klicka and Boyle had a conference in private, and that Pouchot was in the main part of the saloon when Klicka came out and said to Madden, "It is a damn shame and an outrage," and that that was about 11 o'clock A. M.

Emil Klicka testified that he was a member and president and general manager of the Joseph Klicka Company, and that he went to Powers & Gilbert's saloon about 10 A. M. and tried to settle the strike that Frasier could not settle, after having a conversation with Frasier; that he had a conversation with plaintiffs in error and Madden in the little room right off the bar of the saloon; that he knew none of them when he went there, and that two or three other men went into the room with them; that he had a conversation with Boyle and that Madden and Pouchot and Frasier were in there at first, but later all went out and left him and Boyle alone; that he told Boyle he wanted that strike settled, and that Boyle said the union had had a great deal of trouble and expense with the Company, and he told Boyle that he would be willing to give him $200 for the expenses that they had, and Boyle said their executive board would meet at noon, and that he could come back that afternoon and Boyle would give him their answer; that he went to the bank and got $200 and went back in the afternoon; that

Boyle again said to him, "Yes, the executive board of the union had met at noon, and they had placed a fine on you of $1,500;" that nobody but himself heard this conversation in the little room, and that he told Boyle that they could not stand $1,500 and went out; that Frasier was there and witness saw Madden when he came out and told him $1,500 was a little high and also said it was a damned shame or something like that, and that Madden said he didn't have anything to do with it at all; that after that about November 18, 1908, he delivered to George S. Andres a check for $1,000 and that the strike was settled the next day. Klicka then identified that check of that date, November 18, 1908, to Andres, which was in evidence; and on cross-examination testified that the blow pipe contract had been let to the Cyclone Blow Pipe Company, and that he was informed by plaintiffs in error and Madden that under the rules of their association their members had agreed not to work upon new or other buildings in this county where a part of the work was being done by non-union men; that Boyle told him that, as long as he, Boyle, could prevent it, not a a union man would do a stroke of work on that building until all contracts had been let and it was demonstrated to him and those associated with him that every dollar's worth of work was to be done by union men; and that the $1,000 check aforesaid was paid out of the money of the Joseph Klicka Company.

George S. Andres testified that he was a consulting engineer and connected with the work on the Klicka factory; that he had a conversation with Frasier, the superintendent, about the strike and then met Pouchot at Powers & Gilbert's saloon; that Pouchot said there were a number of contractors on the job that were non-union; that he said to Pouchot that he was aware of it, but that their contracts had all been cancelled and that the Company was about to make new contracts with union shops in all of the trades involved in the strike; that Pouchot and he then went

to see the Cyclone Blow Pipe Company and arranged
with Mr. Miller of that company that that company
be allowed to finish its work on the building by em-
ploying non-union men to do its work; that after that
he and Pouchot went to see Madden at Powers & Gil-
bert's saloon; that he stated to Madden that all non-
union contractors had been withdrawn or their con-
tracts cancelled and that there was no legitimate claim
for a further hold up, and that they ought to release
it, and that it was a great hardship on the Klicka
Company, and Madden said he would look into it;
that he left Madden then and went back to Mr. Klicka,
and on the next day met Pouchot in that saloon and
asked him how they came out on the proposition, and
that Pouchot said he would have to see Mr. Boyle;
that he then saw Boyle the same hour in the saloon
and Boyle said he had nothing to do with that part
of it now, that it was up to Mr. Madden; that Madden
came in and he and Madden went to the small room
off the end of the bar and Madden said: "I don't
know you in this matter at all, Mr. Boyle has the set-
tling of this matter with Mr. Klicka. I am not in the
case at all;" that he then asked Madden to state the
amount that was wanted to settle the strike, and that
he, witness, had the matter of settlement in hand and
knew nothing of Boyle and Klicka having the matter
for settlement, but would go see Klicka and find out;
that he saw Klicka and asked the amount that was
wanted for settlement and was told that it was $1,500;
that he then went to Gallagher and Speck, the con-
tractors who had the cancelled contract of Atkins,
Young and Allen, and then talked with Mr. Benoit,
and then attended a meeting of the Master Steam
Fitters' Association; that next morning, Mr. Benoit
and witness called on Madden at the saloon by ap-
pointment, and that Madden said he, witness, had
called a meeting of the Master Steam Fitters' Asso-
ciation to try to have Madden fined $600, and that he
told Madden he was mistaken; that Madden then said,

"You thought you would have me fined $600, and I assure you that I have got the settling of this case, and when you want to do business you have got to do it with Madden;" that he replied that he was aware of that and that that was why he was there, and then said to Madden, "If it is a proposition of money, how much do you want? Will $1,000 settle the strike," and Madden replied, "Bring up the dough," and that witness replied, "All right I will go and get it;" that he then went directly to Mr. Klicka, and received the $1,000 check in evidence, endorsed by George S. Andres, and with it drew $1,000 out of the bank in $100 bills; that he then went to see Madden several times, but did not see him until the following evening (Nov. 19th) about 8 o'clock, and again found him in Powers & Gilbert's saloon, and in the little room said to Madden, "Madden, if this money is paid to you, how will I be assured that this strike will be called off and left off;" that Madden said: "Oh, you need not have any fear about that. We will call it off provided I know it is all right, and there is no further trouble out there;" that witness said, "Isn't it possible to get the price cut down on that job?" and the reply was, "No, you fellows have caused us a lot of trouble out there," and that witness said, "Well, it is $1,000; then you intend to cinch off $1,000," and Madden's reply was, "That is about it;" that witness then said, "Well, here is your $1,000, there is ten $100 bills in that roll." "I never took no money from you," said Madden. "No, I know you didn't, what shall I do with it," replied witness. "Throw it on the floor or on the desk or any where else," said Madden. The witness then testified that he casually threw the money on the desk, and that they talked a little about the conditions of the unions, and that as he stepped out of the room Madden put a blotter over the money, and that the men went to work on the building the next day. This witness further testified that afterwards, during the month of February, he received a subpœna

from the grand jury to appear before it; that before he appeared he had a conversation with Madden over the 'phone and the following conversation was had between them, beginning with Madden: "I understand you are up in this case before the grand jury." "I believe so." "Well, you don't know nothing, you understand." "Yes." "You don't know nothing." "All right."

For the sole purpose of proving guilty knowledge and intent of Pouchot, Boyle and Madden, the state put in evidence testimony concerning the calling under similar circumstances, and the settling under similar conditions, three other strikes. The first of these was called by plaintiff in error, Pouchot, in September, 1908, on a building then being erected by the Jewell Tea Company in Chicago, on the ground that the firm supplying material was non-union. Jacob Schermer, the contractor, testified, in regard to that strike, that he met Pouchot in Powers & Gilbert's saloon and that Pouchot complained of the putting in of certain material called "sleeves," the whole cost of which would not exceed twenty-five dollars; that he told Pouchot he would chop out the whole work and "we will put in new ones, or you may put in new ones with union men and I will pay for it;" that Pouchot replied: "That is not necessary; leave them in, they don't bother us at all. I will tell you, you see Mr. Madden, and you make him a little cash offer and that will be all right." Mr. Shermer then testified that he saw Madden at that same saloon and that Madden asked him to pay $2,750 to settle that strike and that he refused the offer, and that then Madden came down to $1,500, and that he, Shermer, submitted it to Mr. Skiff, the owner of the building. Mr. Skiff then testified that he paid Madden the $1,500 in that same saloon, and that work resumed on the building the next day. Pouchot denied that he had such a conversation with Shermer. Madden made no denial concerning his part in that transaction.

The second strike occurred in the fall of 1908, on a building erected by Sam Grossman, when $200, the price of settlement, was talked over with Pouchot, and that sum was paid to Madden in the same little room in Powers & Gilbert's saloon, and the strike called off the following day. Mr. Grossman and his attorney, Mr. Lowenthal, both testified in regard to that settlement, and Mr. Grossman also testified that he talked to Boyle at this same saloon about the matter and that Boyle claimed he knew nothing about the matter. Pouchot denied ever seeing Grossman or Lowenthal previous to the trial of this cause in the lower court. Madden made no denial whatever.

The third case put in evidence was a strike near the same time of the other two strikes, and on a building erected by H. P. Nelson Company, and for the alleged reason that non-union metal work was being done. This strike apparently involved only Pouchot's union, but was settled by Boyle. While the strike was on Mr. Nelson first saw Madden and Madden referred and introduced him to Boyle, business agent of the Electricians' Union, who demanded and received $1,000 for the settlement of the strike. Mr. Nelson testified to these facts, and further gave in evidence concerning it that he went with Boyle into that same little room in Powers & Gilbert's saloon and asked Boyle what could be done to resume operations on his building; that Boyle then asked him how much it was worth to him to have the building completed, and that Boyle finally told him that it would cost him $1,000, but was not sure, and that he would see the executive committee or some other committee, and for Nelson to come back next day. Afterwards, Nelson saw Boyle at same saloon and was told that was the best that could be done an ! he paid Boyle the $1,000. Boyle and Madden made no denial of Nelson's testimony.

The agreement between the Master Steam Fitters' Association and the Journeyman Steam Fitters' As-

sociation of Chicago was put in evidence, and that agreement which was in force prior to the strike on the Joseph Klicka Company building and up to and including the time of the settlement thereof, provided that all disputes between members of the Employers' Association and the members of the Union should be settled by arbitration, and that no strikes be resorted to pending the decision of the arbitration. It also provided that all material except prison made could be used in a building; that no steamfitter should leave his work because non-union men in any other line were at work on a building.

The by-laws of Local 134, Brotherhood of Electrical Workers, Boyle's Union, in evidence, provides that it shall be the duties of business agents to represent the union in Central Bodies as one of its delegates and to act as manager of the union in the district assigned to them by the Advisory Board, and that the Business Agents shall collect no money from any source for the union, unless directed by the Advisory Board.

The plaintiff in error, Pouchot, in his evidence denied the charges in the indictment in this language: "I never received any money from Mr. Andres or from anybody else representing the Klicka Company for settling the strike on the Klicka Company plant. I never authorized anybody to receive any money for me. I never conspired to obtain any money under any pretense or anything. I never demanded money from anybody. I never conspired with anybody to get any."

Plaintiff in error, Boyle, denied the charge in this language: "I did not conspire, combine, confederate and agree with the defendants, Madden and Pouchot, or with other persons to obtain money by false pretenses from the Joseph Klicka Company. I did not conspire, confederate and agree with Madden, Pouchot and others, to obtain one thousand dollars or any other sum from the Joseph Klicka Company by

extortion.'' Mr. Madden made denial in the same general language as Boyle, and then denied that Andres gave him any money at Powers & Gilbert's saloon; and denied that they talked about money. Both Boyle and Madden admit in their testimony that they met with Andres, Frasier and Klicka at the saloon in question and talked to them about the strike, and testified that Klicka offered them money to settle the strike. Madden, Pouchot and Boyle all testified to the effect that the strike at the plant of the Joseph Klicka Company was called solely by reason of the fact that contracts had been let by that Company to contractors who employed non-union labor, and that when those contracts were re-let to contractors employing union labor, the strike was called off. They particularly say that the strike was called at the instance of one Charles Rau, business manager of the Steam Fitters' Protective Association, because of the contract let to the non-union concern, Atkins, Young and Allen. Mr. Rau, in his testimony, corroborated the contentions of the plaintiffs in error as to the reasons for calling the strike, that it was called at his instance, and called off when that contract was cancelled and an employer of union labor employed to do the job let to Atkins, Young and Allen. There were other witnesses for plaintiffs in error who corroborated their evidence to the same extent as did Mr. Rau. Several witnesses for plaintiffs in error also testify to being at Powers & Gilbert's saloon on the night of November 18, 1908, and that they heard the conversations of Andres there with Boyle and Madden, and that no money was paid by Andres to either of them and that money or payment of money was not mentioned by Andres. Their evidence, however, did not cover the date of November 19th, the day Andres claimed he paid the money. A number of witnesses for plaintiffs in error testified that the general reputation of George S. Andres in the neighborhood in which he resided was bad, and about an equal num-

ber of witnesses for the People testified that his general reputation for truth and veracity was good. A number of witnesses for plaintiffs' in error also testified that there was in existence in Chicago a custom in the fall of 1908 for laboring men who were affiliated with the Associated Building Trades not to work upon a building where non-union men were employed.

A careful study of the evidence in the record compels us to say that the jury were amply warranted in finding plaintiffs in error, Pouchot and Boyle, guilty beyond a reasonable doubt, not only of a conspiracy to obtain money by threats, but also of a conspiracy to obtain money by false pretenses, as charged in the indictment. It can serve no useful purpose to discuss the evidence in detail, or the proving force of the various parts thereof, as it seems to us that the foregoing recital of the substance of the evidence must carry conviction to any one who reads and studies it. It is asserted by counsel for plaintiffs in error that the evidence for the people, assuming it to be true, merely shows that Madden alone conceived the idea of extorting the $1,000 from the Joseph Klicka Company after the strike had been settled, and that Pouchot and Boyle received no part of the money and had nothing to do with extorting it from the officers of the Klicka Company. The charge against plaintiffs in error is that they and Madden conspired to obtain the money by false pretenses and by threats. It was not necessary to prove that Boyle or Pouchot actually received any of the money paid to Madden in order to establish their guilt. It is clearly and satisfactorily proved that they conspired with Madden to obtain the money, as charged in the indictment, and that as a result of that conspiracy the Joseph Klicka Company paid the money to Madden. The existence of a conspiracy may be proved by circumstantial evidence, and when the conspiracy is once established, the acts and declarations of every conspirator in furtherance of the common design are the acts and declarations of all the

conspirators, and are, therefore, evidence against all the conspirators. As soon as the union of wills for the unlawful purpose is perfected, the offense of conspiracy is complete. No proof of an agreement to concur in the conspiracy is necessary. Spies v. People, 122 Ill. 1.

It is also insisted by counsel for plaintiffs in error that the People's evidence does not tend to prove a conspiracy to obtain money by false pretenses, but only tends to prove a conspiracy to obtain money by threats. It must be remembered that plaintiffs in error were not indicted for obtaining from the Joseph Klicka Company $1,000, designedly by false pretenses and with intent to cheat or defraud said company, under Section 96 of our Criminal Code, but were indicted under Section 46 thereof, for conspiracy to obtain money by false pretenses, etc. Proof that there was such a conspiracy was all that was necessary in this case. "A false pretense is such a fraudulent representation of an existing or past fact, by one who knows it not to be true, as is adapted to induce the persons to whom it is made, to part with something of value." 2 Bishop on Criminal Law, 415; Jackson v. People, 126 Ill. 139. "If the possession of property is obtained by fraud, and the owner of it intends to part with his title as well as his possession, the offense is that of obtaining property by false pretenses, provided the means by which they are acquired are such as in law are false pretenses." People v. Miller, 169 N. Y. 339-352.

Plaintiffs in error and Madden falsely pretended that they had authority from their unions and control of the workmen employed; that is to say, that they were authorized by their union or unions to collect so much money from the Joseph Klicka Company as a fine or for expenses incurred in the strike, and that they had such control of the men that the Company could not proceed with their building until this fine was paid. The Klicka Company were deceived there-

by, and were induced to pay the money upon the belief that plaintiffs in error and Madden had such authority from their union, and such control, when in fact they had not been so authorized by the union to collect any money at all and the union or workmen were falsely led to believe that plaintiffs in error and Madden were laboring simply to unionize the various contracts or jobs on the building. The evidence clearly shows these facts and that the intent of plaintiffs in error was really to obtain the money for themselves or for Madden by such false pretenses. It is scarcely believable that the workmen on the building would have suffered themselves to be kept away from their work had they known of the false pretenses of Boyle, Madden and Pouchot, or that the company would have parted with their money if it had known the unions were not behind Boyle, Madden and Pouchot in their demands for money.

In addition to a general denial of the charge that they called a strike of the workmen at the Klicka plant with intent to extort $1000 in consideration of settling the strike, plaintiffs in error offered to prove that the idea of calling a strike did not originate with them, but with Mr. Rau, business manager of the Steamfitters' Protective Association. Mr. Rau did so testify, and in further proof thereof the conversation or declarations of Pouchot to Mr. Rau upon the subject of calling the strike when urged by Mr. Rau were sought to be put in evidence by plaintiffs in error, and also as to what Madden said when his attention to the proposed strike was called, and on objection by the state the evidence was excluded as self serving declarations. We think the evidence was competent upon the well settled rule that all declarations made by an accused while engaged in the doing of any act in furtherance of the alleged criminal transactions are admissible in favor of, as well as against the accused, as part of the *res gestae.* Mack v. State, 48 Wis. 271; Comfort v. People, 54 Ill. 404; Bennett v.

People, 96 Ill. 602. Assuming that the answers would have been most favorable to the plaintiffs in error, we do not think that the error was serious, or that the evidence would have had any tendency to produce a different verdict. All the evidence bearing upon the question shows that the strike was first urged by Rau, and that plaintiffs in error called the strike after such request of Rau and others. The record is full of their declarations to the Klicka Company that their purpose was to unionize the work on the building, and no additional amount of declarations as to their purpose made during counsels for a strike in our judgment would have had serious weight with the jury in convincing them that Pouchot and Boyle did not also have the unlawful purpose charged in the indictment. Inasmuch as the court was not informed in any way by plaintiffs in error as to what declarations they expected to prove by Rau that were made by them at the time in question, the court committed no reversible error in its ruling. Gaffield v. Scott, 33 Ill. App. 317.

It is further argued by plaintiffs in error that the admission of the three other criminal transactions by them was error as they were not charged in the indictment, and not in any way connected with the crime charged in the indictment. It is said in plaintiffs in error's brief that the court was undoubtedly led into this error by believing that the People's evidence tended to show a case where plaintiffs in error conspired to obtain money by false pretenses. We have already discussed the question of whether or not such a conspiracy was established by the evidence. "There must be a criminal intent in conspiracy which involves knowledge." 2 McClain on Criminal Law, sec. 971; People v. Powell, 63 N. Y. 88.

In the case in hand the plaintiffs in error, Boyle and Pouchot, insisted that they got no money from Madden or any one else as fruits of their work in the

Klicka strike, and that their object and intent were solely for the purpose of unionizing the contracts and protecting their unions against the employment of non-union labor. They were not present when Madden received the money. They insisted they had power to settle the strike from their unions when the jobs were unionized. The State does not deny that, but does deny that they had power to settle it for money and insists that they did so settle it. They made a question before the jury of whether their purpose was in the interest of union labor or for the corrupt purpose charged. So far as Madden is concerned, the People's direct evidence clearly established, in itself, if true, the corrupt purpose charged in the indictment, but he, Pouchot or Boyle, could not be found guilty of conspiracy, unless one or both the others were proved guilty. As Madden is now out of the case, this question need not be discussed as to him.

Wherever in a conspiracy or other similar case it is necessary to prove a particular intent, as in this case, and the evidence in regard to the crime charged tends to show two intents as to one or more of the defendants, one intent being an innocent or other intent than the one charged, and the other intent being the corrupt intent charged, evidence of other similar offenses is admissible as to such defendants for the sole purpose of proving such corrupt intent, if such evidence tends to prove such intent. State v. Lewis, 96 Iowa, 286; Wallace v. State, 41 Fla. 547; Bottomly v. United States, 1 Story 135; People v. Peckena, 153 N. Y. 576; Crum v. State, 148 Ind. 401; Du Bois v. People, 200 Ill. 157; Juretich v. People, 223 Ill. 484; People v. Hagenow, 236 Ill. 514; Marshall v. United States, 197 Fed. 511, opinion *per curiam*.

In People v. Molineux, 168 N. Y. 293, the New York Court of Appeals uses this language: "Generally speaking, evidence of other crimes is admitted to prove the specific crime charged when it tends to es-

tablish, (1) Motive; (2) Intent; (3) The absence of mistake or accident; (4) A common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) The identity of the person charged with the commission of the crime on trial.'' We do not think it was error to admit the evidence in question to prove the intent of Boyle and Pouchot, and the court expressly so limited the evidence at the time it was admitted, and also by its instructions. This evidence, however, should have been limited in each particular instance to the parties concerned therein, if so requested by the party not concerned. These particular acts were not acts in furtherance of the common design or conspiracy charged, and were therefore not legal evidence against the other party taking no part therein. Boyle was the only party to make the objection that the evidence was for that reason not applicable to him, and he only made this objection in the first case.. The objections to the evidence in the other two instances were general objections by all the parties. As the court directed the jury by instructions that such evidence could only be considered for the purpose of proving guilty knowledge, Boyle could not have been seriously prejudiced thereby, as a transaction in which he took no part could not tend to prove an intent as to Boyle, and the evidence was admissible anyway as to Pouchot for the purpose of proving his guilty knowledge. Besides, the other two instances were properly admitted against Boyle and so there was quite enough legal evidence of such character against both Boyle and Pouchot. For the same reasons we do not think it was serious or reversible error for the court to omit to say specifically in the instructions for the People that such evidence should only be considered as tending to prove guilty knowledge of the defendant or defendants who took part therein. Practically the same instruction in effect was given for plaintiffs in error in their instruction No.

31, which also failed to make the limitation that they insist is wanting in said People's instructions numbered 12 and 13, and, therefore, they are not in very good position to complain of such error.

We have virtually already disposed of the objections as to People's instruction No. 14, that it asks the jury to take into consideration the counts of the indictment that charge a conspiracy by means of false pretenses, when there was no evidence tending to support them. We think the evidence does tend to support them, and that instruction No. 14 for the People was properly given. We think that the proof in this case clearly warrants the finding of the jury, and that it must have been the same had the record been free of the slight errors above noted, and that as said in the case of Jackson v. People, 126 Ill. 139, such errors should be held as no ground authorizing a reversal. The judgment of the lower court, will, therefore, be affirmed as to plaintiffs in error, Pouchot and Boyle.

*Judgment affirmed.*