# The People of the State of Illinois, Defendant in Error, v. Charles Bischoff et al., Plaintiffs in Error.

## Gen. No. 29,957.

1. CONSPIRACY—*sufficiency of evidence to show guilt of employees of principal defendant.* In prosecution for conspiracy to get money by false pretenses or a confidence game, evidence held not to show guilt on the part of certain defendants who were merely employees of principal defendant.

2. CONSPIRACY—*investment of own money by alleged conspirator with principal defendant as proof of guilt of conspiracy to defraud others.* Persons misled by representations into the belief as to soundness of transactions to the extent that they invested large sums themselves were not guilty of conspiracy to obtain money by false pretenses or a confidence game by reason of the fact that they induced others to invest their money.

3. CONSPIRACY—*sufficiency of evidence to show guilt of defendants related to principal defendant.* In prosecution for conspiracy to obtain money by false pretenses and a confidence game, evidence held to sustain conviction of certain defendants who were related to the main defendant.

4. CONSPIRACY—*sufficiency of evidence to show intent, motive, design and concerted action.* In prosecution for conspiracy to obtain money by means of false pretenses and a confidence game, evidence held sufficient to establish intent, motive, design and concerted action with knowledge of the fact.

5. CONSPIRACY—*participation by concealment of fraud.* It is a fraud to conceal fraud, and by such concealment one becomes in the eye of the law an accomplice.

6. CONSPIRACY—*proof requisite to conviction.* In prosecution for conspiracy to obtain money by means of false pretenses and a confidence game, it was not necessary to show whether or how each of the defendants was to participate in the receipts, it being sufficient to show that they participated in the conduct, the overt acts, which constitute, considered as a whole, a conspiracy to obtain money by false pretenses or the confidence game.

7. CONSPIRACY—*sufficiency of evidence to show conspiracy to defraud persons named.* In prosecution for conspiracy to obtain money by means of false pretenses and a confidence game, evidence held to show a conspiracy to defraud the specific persons named in the indictment.

8. CRIMINAL PROCEDURE—*other offenses admissible to show intent*

*and knowledge.* In prosecution for conspiracy to obtain money by means of false pretenses and a confidence game, evidence of other offenses tending to show the intent and knowledge on the part of the conspirators was admissible.

9. CRIMINAL PROCEDURE—*election by state in misdemeanor case.* In prosecution for conspiracy to obtain money by means of false pretenses and a confidence game, where indictment charged conspiracy to defraud different persons, it was discretionary with the court to deny a motion of the defendants that the State be required to elect as to which offense it would seek a conviction on, the crime charged being a misdemeanor.

Error by defendants to the Criminal Court of Cook county; the Hon. KICKHAM SCANLAN, Judge, presiding. Heard in the third division of this court for the first district at the March term, 1925. Affirmed. Opinion filed October 28, 1925.

LITSINGER, HEALY & REID, for plaintiffs in error.

ROBERT E. CROWE, State's Attorney, EDWARD E. WILSON and CLARENCE E. NELSON, for defendant in error.

MR. JUSTICE TAYLOR delivered the opinion of the court.

The defendant, Charles Bischoff, was indicted and charged with taking part in a conspiracy to obtain money by means of false pretenses and a confidence game. There was a trial before the court, with a jury, and he was found guilty and sentenced to imprisonment in the penitentiary and fined $2,000. This is a writ of error to reverse the judgment on that verdict and sentence.

The indictment was against the following: Raymond J. Bischoff, Charles Bischoff, Thomas O. Davis, E. G. Gear, T. D. Wilson, Charles Darwin, Stephen Bagowitz, Walter Silver, Frank Shaput, Karl Joblowski, Walter Tuskovski, Matthew Venckus, James Jornak, John Mickevitz, John Karbanski, Charles Stankus, Adolph Sparkevitz, Alex Kissel, Anton Walukas, Joseph Chatro, Felix Jawgill and Frank Dalkus.

It charged that on February 10, 1922, they did un-

lawfully, fraudulently and maliciously combine, conspire, confederate and agree together and with divers other persons whose names are unknown, with the fraudulent and malicious intent to wrongfully, wickedly and unlawfully obtain certain sums of money from certain specified persons and unknown sums of money from persons whose names were unknown, by false pretenses, and by means of the confidence game.

The indictment contained twelve counts. The third and fourth counts were dismissed and the eleventh and twelfth counts were quashed, and the case was tried on the remaining eight counts. The latter counts charged the obtaining of $2,000 from Walter Butkiewicz; $3,900 from Frank Lokis; $1,900 from Francis Laurinaitis; and $2,100 from Alice Jankus; four counts charged false pretenses, and four the confidence game. A separate trial was granted to Wilson, Darwin, Mickevitz and Sparkevitz. The State caused a *nolle prosequi* to be entered as to Bagowitz, Silver, Jornak, Kissel, Walukas and Jawgill. Raymond J. Bischoff was not apprehended; and the record is silent as to Joblowski and Chatro. Thomas O. Davis was presumed to have died. The defendants Venckus and Stankus were tried and found guilty and fined, and the fines paid. Writs of error have been sued out by Charles Bischoff, E. G. Geer, Frank Dalkus, Walter Tuskovski and John Karbanski and Frank Shaput, and all were consolidated for the purpose of a hearing.

In this opinion, we shall consider not only the case of Charles Bischoff, but all the writs of error that were consolidated for hearing, and shall adopt this opinion in each of the other cases in so far as it is pertinent and appropriate.

Raymond J. Bischoff and Charles W. Bischoff were brothers. In 1920, the former was about 26 years old, and the latter a few years older. Earl Geer was their brother-in-law, having married their sister. Davis was the stepfather-in-law of the Bischoff

brothers and stepfather of their sister. In 1920, the
two Bischoffs had letterheads printed with the title,
Bischoff & Bischoff, and had offices in the Marshall
Square Building, at Marshall Boulevard and 22nd
street, Chicago. The testimony of Charles Bischoff
is that at that time they were not partners; that each
did his own business although they used the same of-
fice; that he, Charles, at that time was selling insur-
ance; that he solicited insurance from the numerous
clientele of his brother. The business of Raymond
J. Bischoff in Chicago seems to have started by deal-
ing in stocks. What he actually did is shown only by
the evidence of others. He was not apprehended and
did not testify. One Karbanski testified that he first
met him on August 30, 1919, and that Raymond said
he was a Boy Scout master; that he told him, the
witness, that if he would give him some money to
invest, he would make money for him, the witness;
that at the time he gave Raymond J. Bischoff $100,
and several months afterwards the latter paid it back,
and he, the witness, then let him have $300 and later
Raymond J. Bischoff paid him $500; that when he
first spoke to Raymond J. Bischoff, the latter men-
tioned the stock market.

The testimony of Charles Bischoff is that in Febru-
ary, 1920, he left the Rock Island arsenal where he had
been supervisor of personnel, and came to Chicago
to work for his brother; that his brother, having pur-
chased a patent on an aluminum cooking utensil, was
trying to put it on the market; that his, the witness's,
duty was to have the dies made and have the utensil
manufactured; that he continued at that work for
about three months; that in the early part of 1920,
he went with his brother to a stock broker's office
and watched him make some trades, and at his
brother's suggestion took a "flyer" in Vanadium
Steel and Polodium Steel, buying, together, 50 shares,
on which, in the course of two weeks, he made $110

on a $100 investment; that after working on the patent kitchen utensil, for about three months, he went back to his former work of selling insurance and real estate, which he continued until January, 1921; that then, at the request of his brother, he went to LaCygne, in Kansas, to represent his brother as to some oil properties that his brother had bought there; that his duties were to complete certain drilling developments that his brother had already inaugurated.

In June, 1919, Earl Geer married a sister of the two Bischoffs. He had spent two years in the army, one of which was in France, and had worked for some time for several automobile agents. In the spring of 1920, he went to work for Raymond J. Bischoff as manager of an automobile salesroom which Bischoff had on Western avenue. Geer testified on direct examination that he was manager of that business for Raymond J. Bischoff, but on cross-examination, that although Bischoff financed it in 1920, it was practically his, Geer's own business; and that it was not incorporated, though operated in the name of Bischoff & Company. In the fall of 1920, Geer went to work for Raymond J. Bischoff in the latter's office, in the clerical department. He says that at no time did he have anything to do with the management of Raymond J. Bischoff's business, and was never consulted about any investments; that he never invested any money in that business, but that his wife did, and lost about $1,150. One Wilson, who worked for Raymond J. Bischoff as cashier, testified that Geer was a general handy-man; that some times he worked in the cashier's cage and some times ran errands; that he also sold wind shields and patent pots; and that if there were mistakes in the records he would try to settle them, and would try to settle difficulties between customers and agents as to amounts of money in dispute. When Geer first went to work for Raymond J. Bischoff he got $50 a week, and later about $90 a week. Wilson, the cashier, testified that Geer was

assigned to the cashier's cage and took money in, and
was in R. J. Bischoff's office practically every day;
and also talked with customers. Poska testified that
Raymond J. Bischoff told him that Geer was manager,
and what he said should be obeyed and carried out.

Apparently, in the early part of 1920, there was
brought into being by Raymond J. Bischoff a busi-
ness called R. J. Bischoff & Co. Just when and ex-
actly how it was started does not appear to be clearly
shown. It was not a corporation. What the pur-
pose of Bischoff & Bischoff was is not clearly shown.
The chief business of R. J. Bischoff & Co. seems to
have been to borrow money, and in return give promis-
sory notes, with the representation, express or im-
plied, that interest would be paid at 10 per cent, or
more. The cashier, Wilson, testified that he under-
stood that R. J. Bischoff & Co. was made up of Ray-
mond J. Bischoff alone.

Davis, the stepfather of the Bischoffs' sister, worked
in the office of R. J. Bischoff & Co. At the time of
the trial representations were made that he was dead.
In his lifetime, he had acted as office manager for
R. J. Bischoff & Co. Wilson, the cashier, stated that
towards the last the offices of R. J. Bischoff & Co.
consisted of four rooms and the cage; that one was
used by Raymond J. Bischoff, one, the middle room,
was occupied by Davis, and an office girl, one was
used for a loafing place for men, and one for the
clerical help. Wilson also testified that Davis was
the office manager, or in charge of the office of R.
J. Bischoff & Co., and was in charge of the office in
the absence of Raymond J. Bischoff. Wilson went
to work for R. J. Bischoff & Co. in May, 1920, and
worked there until the company went into bankruptcy
in 1922. His duties were to receive the money that
was brought in and to pay all notes that were due
and account for the money during the business day.
There were employed in the office of R. J. Bischoff
& Co., according to his testimony, himself, as cashier,

Faza, an assistant to him, Geer, Davis, Mrs. Talbot, stenographer and secretary, Beatrice Marr, a stenographer, Miss Corrigan, general office work, and Miss Faza. He testified that Charles Bischoff was at the office on different occasions, but, as far as he could see, as a visitor.

Although Wilson was a defendant, with the others, who were named in the indictment, he was granted, on motion, a separate trial. He was called as a witness by the State, and his testimony contains the chief statement concerning the business methods and business done by R. J. Bischoff & Co. His evidence is that Raymond J. Bischoff (or R. J. Bischoff & Co.) had a number of men he called agents or field men whom he employed at $25 to $35 a week to go out among the people and tell them that he had a "special" on for a certain date and if they wanted to invest in it they could bring the money in to the office themselves, or the agents could do it for them; that when the people paid their money they were given promissory notes, which ran for a month or more up to a year; that Raymond J. Bischoff held meetings of the agents, known as field agents meetings, about once a week upstairs in the Marshall Square offices; that some of the field agents who were present from time to time were Shaput, Bagowitz, Venckus, Stankus, Silver, Walukas, Tuskovski, Karbanski, Jornak and others; that he attended 50 or 75 of those meetings; that at the meetings he heard Raymond J. Bischoff talk about his various enterprises and what returns he expected to get from them; that he heard him speak of his oil lands, how well they were going, of an automobile body factory at Columbus, Ohio, and of the Universal Stamping Factory; that he heard Bischoff say that they were drilling wells and that some of the property was already producing; that he would say, for example, that he had a "special" for a couple of months in the future and that he expected it to pay 10 or 15 per cent; and that he had a good deal on

in which he was going to use more money and expected it to return big profits; that he told the agents to go out and tell the people, the customers, about it. He further testified that there were about 50 specials; that a special, according to his understanding of Raymond J. Bischoff, was a special transaction that he had on hand, such as a transaction on the stock market or in oil lands, or concerning the body factory at Columbus, for which he wanted to use a certain amount of money for two to six months, which money he was going to use and invest in one or two of those various enterprises; and that in return for the money he would give each investor his own simple promissory note, running for a month or a longer time, up to a year, and bearing interest at 10 or more per cent. He further testified that the notes were made out in series and numbered, such as "5, series, 100010"; that as a series matured, Raymond J. Bischoff would tell him how much interest to pay, 10 or 15 per cent, for example; that if he said 10 per cent and the customer presented a note of that series for $100, he would pay him $110; that he had authority as cashier to pay all notes of a particular denomination as they came due, unless he was told otherwise; that before the bankruptcy proceedings he was so told and stopped making payments; that the amount of money taken in on specials from day to day ran from $10 to $200,000, though there were not more than two days when the latter amount was received.

As to the conduct of customers, he testified that they presented their notes at the cage and were paid in cash if they wanted it; that some of the customers took the money away with them, that a great many others walked around the office and then reinvested it; and others would keep it two or three days and then bring it back. The evidence showed that generally after the agents had received their instructions and information about "specials" there would be a

very large increase in the amounts that customers brought or sent in.

The agents, many of whom lived in the stock yards district, according to Augustiniak, were first customers then agents. They would bring in money from various people and then notes would be made out for the particular amounts; the investments were usually small at first, but frequently grew into larger and larger amounts.

Three of the six defendants, Karbanski, Tuskovski and Shaput, were field agents. Karbanski first met Raymond J. Bischoff and made his first investment on August 30, 1919. He later became an agent. He had worked in the stockyards for Nelson Morris & Co. for 25 years. On his investment in R. J. Bischoff & Co. he lost $5,500. Tuskovski, who had been in the saloon business, became a field agent, the exact time is not shown, and, as a customer, invested in R. J. Bischoff & Co. and lost about $7,000. Shaput, who had been a laborer for Armour & Co. at the stockyards, began work for R. J. Bischoff & Co. as a field agent in April, 1920. He testified that his loss was about $7,000. The defendant Dalkus first dealt with R. J. Bischoff & Co. in April 1920 or 1921, first as a customer, then as an employee. Prior to that, he had been in the restaurant business, and before that, from 1911 to 1917, he was a wrestler. He was employed as door tender and to run errands. He testified he lost throught R. J. Bischoff & Co. about $16,000. The other defendants were Charles W. Bischoff and Geer.

Apparently, one of the chief things considered by Raymond J. Bischoff as a plausible asset in his business, and which he used as the basis of obtaining money, was stock in the Y Gas & Oil Company. Venckus said it was Bischoff's "main."

In April, 1921, R. J. Bischoff got up an excursion to take field agents and customers to certain places in Kansas and Louisiana to see what he claimed were

his oil properties. A special train of four Pullmans was engaged. It cost about $7,000, all of which was paid for by R. J. Bischoff. The passengers numbered about 125. All the defendants were aboard, except Charles W. Bischoff, who at the time was already at the property in Kansas which was to be visited. The first stop was at LaCygne, Kansas, where they met Charles W. Bischoff, who had already prepared, pursuant to a telegram he had received from his brother, a dinner for 125 people. The party was then taken around with Charles W. Bischoff in charge, and shown various oil wells, and witnessed the "shooting" of one particular well. Raymond J. Bischoff, according to Wilson, the cashier, said the property belonged to him. They were shown, altogether, 12 or 13 small wells. They were then taken to Vivian, Shreveport, Harmon and Eldorado, Louisiana. Charles W. Bischoff was with them. At Harmon, they were shown 15 to 20 wells, with derricks, which Raymond J. Bischoff said he owned. At Vivian, they looked over some oil fields. Wilson testified that, though not positive, he thought Raymond J. Bischoff said they belonged to him. At Eldorado, they looked at oil fields, covered, as Wilson says, with oil wells in such numbers that he could not estimate them. Both Raymond J. and Charles W. Bischoff were there with all the others. Raymond J. Bischoff told them that he wanted to take them out and show them a well that he was contemplating buying. Wilson testified that he could not state positively whether Charles W. Bischoff was present at any time when Raymond J. Bischoff said he owned the various oil wells. From Eldorado, they came back to Chicago, making an intermediate stop, for pleasure, at Hot Springs, Arkansas. The witness Augustiniak testified that they also stopped at Morningsdale and saw some oil wells and fields; that Raymond J. Bischoff said he owned oil wells in the Kado Lake region in Texas; that he took the trip because Raymond J. Bischoff asked him to go and see his

oil wells. He also testified that Raymond J. Bischoff expected 3,000 barrels of oil, but that later the engineer said they were getting 2.

Poska, a physician who was on the trip, testified that they saw three oil fields; that Raymond J. Bischoff said there were 108 wells; that he made a speech and said that some of them belonged to the company. On the trip, Geer, according to Poska, went around talking to the men. Paulanski, a customer, testified that on the trip Charles W. Bischoff said to him, "We are going to do a big business," and told him that he, Charles W. Bischoff, was manager of the wells.

Butkiewicz testified that he was on the trip and saw oil wells and drilling, but saw no oil.

The evidence as to the market value of the Y Oil and Gas Company stock is somewhat indefinite. Charles W. Bischoff testified that, at his brother's request, he bought 2,500 shares at 85 or 86 cents a share and later sold it at 22 or 23. Butkiewicz testified that Raymond J. Bischoff was president of the Y Oil and Gas Company; that he paid $400 for 500 shares, that Dalkus told him they would be able in a few months to sell them to Bischoff & Co. for $2 a share; that at the time of the trial they were worth from 5 to 10 cents a share. Tiedebohl testified that Y Oil was dealt in on the New York curb.

According to the testimony of Paulanski, in the summer of 1921, there was a picnic given at Willow Springs, at which 4,000 people were present, and that they were addressed by both the Bischoff brothers; that Dalkus and Geer were present; that he did not hear anything that was said.

The defendant Charles W. Bischoff testified on October 14, 1921, he was present at a birthday party given for his brother; that besides himself and his brother there were present Mr. Wetten, Raymond J. Bischoff's confidential attorney; H. A. Massey, of H. A. Massey and Co., Roberts, of Roberts, Hitch-

cock & Co., George Gerue, manager of the Chicago office of E. H. Clark, Geer and two or three others; that in the course of the conversation, it was stated that his brother, through stock purchases in the market, had obtained control of the Y Oil and Gas Company; that Mr. Wetten proposed a toast, that they all drank to the solvency of Raymond J. Bischoff, and that the "Y" oil alone, would, with the prospects it had in sight at that time, enable him to liquidate all of his indebtedness without touching a single dollar of his investments, and leave him close to a million dollars' profit.

One Tiedebohl, a lawyer, testified that on February 11, 1922, in the office of the receivership department, he had a conversation with Raymond J. Bischoff; that at that time the Central Trust Company had been appointed receiver and that bankruptcy proceedings were begun on February 11, 1922; that at that conversation Raymond J. Bischoff stated that he owed about $4,500,000 to about 4,000 different persons; that he had bought Y Oil & Gas Co. stock through various brokers for his own account, and paid various prices for it; that he had bought general listed stocks on the New York Stock Exchange on margin; that he stated on another occasion that he had lost $2,000,000 in Y Oil & Gas Co. stock. Upon motion for the defendants, his testimony as to what Raymond J. Bischoff said after the bankruptcy proceeding was stricken from the record.

Wilson, the cashier, testified that there was a demonstration at the offices somewhere around October, 1921, and that Davis said, "I have just received a telegram from Mr. Bischoff and the substance of it is to tell the men and the customers I have over $7,000,000.00 in assets, more than enough to pay off every obligation I owe."

On February 11, 1922, bankruptcy proceedings were instituted. On the morning that that occurred, Zylius testified there was a crowd of persons present at the

offices, and C. W. Bischoff stood on a table and addressed them. He said they were having trouble on account of the banks; that if the people would stick together with R. J. Bischoff & Co. and have money enough in case there are court proceedings to cover courts costs, they would never lose and the business would go on as before; that the banks were paying only a small per cent, and R. J. Bischoff & Co. was paying a large per cent, and so the banks were jealous and trying to destroy them.

The question arises whether the evidence sufficiently proves that the defendants were guilty of a conspir-- acy to obtain $2,000 from Butkiewicz, or $3,900 from Lokis, or $1,900 from Lauranaitis, or $2,100 from Alice Jankus by means of false pretenses, or by the confidence game. Considering the conduct of Raymond J. Bischoff, as shown above, he was evidently engaged in and furthered a gigantic swindle. There is no evidence that he owned anything of substantial value at any time. Seemingly, when practically penniless, he began in the stock market, in a small way, dealing on margins, and in a short time was exploiting oil properties. He got, in the aggregate, fabulous sums of money merely by making extravagant representations and giving promissory notes with a promise of unusual interest. To get the money, he hired so-called field agents, who went about among a class of people, apparently, easily impressed by suggestions of large and quick profits. At the same time, by what he said and by keeping concealed his accounts and the exact nature and quantity of his assets and liabilities, he succeeded even in deceiving those he employed, whether as field agents or in the office; so that the defendants themselves, who are charged with conspiracy, all except Geer, though his wife was a loser, became investors and, ultimately, losers. So effective were his machinations that on each of several days the amounts received at his offices aggregated $200,000.

The first amount charged in the indictment as having been obtained by the alleged conspiracy is $2,000 from one Butkiewicz. He was, by trade, a tailor. He testified that sometime in 1920 he met Shaput, one of the defendants, who told him about the business and said that it sometimes paid 50 sometimes 100 per cent; that he then invested $100, and then later, $250, though whether he paid the money to Shaput or some one else he was not sure; that the first month he got 75 per cent on the $100; that then in two or three months he got 50 or 60 per cent; that he, also, did business in August, 1921, with one Dalkus; that on September 17, 1921, he gave a check to Dalkus for $2,000, and in five or six weeks got $200, and in a month, in the fall of 1921, got $420 more, but nothing thereafter; that he got from Dalkus a Bischoff note for $3,000; that he gave Dalkus $400 for 500 shares of the Y Oil stock; that Dalkus told him that in a few months Bischoff was going to buy them back at $2 a share; that he, also, did business with Stankus, giving him $300 on specials; that Dalkus told him he had invested money in Bischoff's; and, after the bankruptcy, Dalkus told him that he too had lost money in the business. Butkiewicz testified that he lost altogether over $3,000. Dalkus testified that he never solicited money from Butkiewicz, but did receive a $2,000 check and indorsed Butiewicz's name on it, and cashed it and turned the money in to R. J. Bischoff & Co. Shaput testified that in June, 1920, he explained to Butkiewicz the business of R. J. Bischoff & Co., and solicited him to invest; that Butkiewicz then gave him $250 to invest; that at that time he had invested $300 of his own money; that he did not tell Butkiewicz that he would get 75 per cent on his money.

The second amount alleged to have been obtained by the alleged conspiracy is $3,900 from Frank Lokis. He testified that he first heard of R. J. Bischoff & Co. through a janitor; that he dealt with the company for about nine months; that sometime in August, 1920,

he went to the offices and talked with the defendant, Karbanski, and gave him $1,000; that Karbanski later brought him a receipt from the company; that after that investment Karbanski called on him and asked him to invest further; that he said they would make money; that he said they would pay 6 per cent and a good bonus; that the company's business was in oil lands; that he invested ten or eleven times, a total of $3,907.    Karbanski testified that Lokis first came to the office of R. J. Bischoff & Co. and asked him about the business, and invested $1,000, and later invested more; that he told Lokis about specials that Raymond J. Bischoff had told him, the witness, about. He further testified that he invested himself and lost $5,200, part of which he had saved from 25 years of work.

The third amount alleged to have been obtained by the alleged conspiracy is $1,900 from Francis Laurinaitis.    He testified that he dealt with Matthew Venckus; that in 1921 he was taken to the offices of R. J. Bischoff & Co. and Venckus told him he was agent for Bischoff and that Bischoff had oil and gold mines and big farms, and that good interest would be paid, and he would get a guaranty; that he gave Venckus $1,000, then $500, then $400, and then $200; that he received $100 interest on the $1,000; $50 on the $500, and nothing further; that he never got back his $2,100; that Venckus spoke English, was an educated man; that he canvassed from house to house. Venckus did not testify.

The fourth amount alleged to have been obtained by the alleged conspiracy is $2,100 from Alice Jankus. She testified, partly through an interpreter, that she gave Tuskovski, who lived near her, four or five sums amounting to $900, for which she received four notes; that he told her it was partly for oil stock and partly for a special; that the money belonged to her and her husband.    Tuskovski testified that he induced her to invest $900; that he invested, himself, and lost $7,000.

Quite a volume of evidence was introduced tending to show various amounts of money which were obtained from persons other than the four above mentioned.

Considering the evidence as it pertains to Shaput, Dalkus, Karbanski and Tuskovski, does it show that they took part in the alleged conspiracy? We do not think it does. Shaput worked for R. J. Bischoff & Co. from April, 1920, to February, 1922, and his ultimate loss from investments he made in R. J. Bischoff & Co. was $7,000. Dalkus went to work for the company in September, 1921, as a door tender. In a short time, beginning before he went to work there, he made a number of investments in the company, which together amount to about $26,000. When he started to invest he had about $35,000 in bonds, mortgages and money. He made his last investment amounting to $19,000 in December, 1921. He was given notes representing his investment. He lost $16,000 and his sister, also, lost at least $3,000.

Karbanski started to work for Raymond J. Bischoff in March, 1920. He got $9,200 in notes and lost $5,500, having received $4,000 in dividends. The money he invested he had saved from 25 years of work. Considerable evidence was introduced in regard to large investments, amounting to about $41,000, that were made by Father Briszko, out of which he lost about $24,000. Also, evidence was introduced concerning representations made by Karbanski to him. It would extend this opinion too much, however, to set forth even a résumé of the evidence in regard to Father Briszko's relations with the company. Suffice it to say, it does not show that Karbanski did more than exploit what he had been led to believe and on which belief he acted and relied in making investments himself.

Tuskovski worked for R. J. Bischoff & Co. He had formerly been a saloon keeper. He got $28.50 a week. He invested $7,000 and lost all of it. The

last investment he made was in December, 1921, and was for $1,000. There is no evidence whatever that Shaput, Dalkus, Karbanski or Tuskovski conspired or took part in any conspiracy.

If a so-called agent invested his own money, and it be assumed honestly expected and believed it would make a profit, how can it be said that, when he persuaded a customer to make a similar investment, he expected and believed that that investment would not make money. The two states of mind are incompatible. If he obtained the money of the customer by making false representations, then when he invested his own money he must have been wittingly cheating himself. The only question then is whether, believing the representations they made to be reasonably true, true enough to justify investing themselves, they were guilty of false pretenses or the confidence game, because the actual truth as to the condition and business methods of Raymond J. Bischoff did not, according to known general economic principles, reasonably justify the making of the representations they acted on themselves when they made their own investments. Having no evil intent, but having insufficient knowledge of the truth, yet enough to inspire them to invest their own money, were their representations, which they believed to be true, a crime, as being part of a conspiracy to get money by false pretenses or a confidence game? We do not think so. Undoubtedly, Raymond J. Bischoff got money from all of them by false pretenses; but because each of the four above mentioned believed them and repeated them to others, did not make them conspirators. Each one might be liable in tort for making representations without having exercised ordinary care as to their truth, but not chargeable with a crime. Because each was the innocent tool of a criminal, they were not necessarily legally *particeps criminis*.

The evidence as to the conduct of Charles W. Bischoff, the brother, and Geer, the brother-in-law, is of a

different quality. It may well be said to show beyond
a reasonable doubt that they knew and participated
in the gigantic swindle. From February, 1920, when
Charles W. Bischoff came from Rock Island and went
to work for his brother until bankruptcy, although he
says that, after three months, he went back to selling
insurance and into the real estate business, it is quite
obvious that he was part of and participated in the
business of his brother. Their earliest business rela-
tionship is shown by having, as Charles W. Bischoff
says, letterheads printed in the name of Bischoff &
Bischoff. In January, 1921, he says he went to Kan-
sas, at the request of his brother, to represent him as
to certain oil property he had bought in Kansas. He
apparently had charge of or advised his brother con-
cerning oil properties. He took part in the early part
of 1920 with his brother in a small stock deal. He re-
ceived and helped entertain the company that went
on the special train through the West and South.
Walukas testified that on that trip Charles W. Bis-
choff said they had 80 oil wells; that it cost $1.00 a
barrel and would sell for $4.00 a barrel; and that after
they came back to Chicago, Charles W. Bischoff said
to him, the witness, "I have got a good special, and
you put on that special. You get about dollar to three
dollars, you know"; and that he then invested $400.
Father Briszko, who lost about $24,000, stated that
in 1921 he had a talk with R. J. Bischoff, in his of-
fice, in the presence of Charles W. Bischoff; that he
was introduced to the latter by his brother; that
Charles W. Bischoff, on that occasion, told him of cer-
in the firm of R. J. Bischoff & Co. and that Bischoff
& Co. and showed him, on maps on the walls, where
they were in Louisiana, Kansas and other places; that
he explained how many hundreds and thousands of bar-
rels of oil they were getting every day; that he showed
him a sample bottle of oil; that Raymond J. Bischoff
was present during the whole conversation. Zylius,
as set forth above, stated that on the morning of the

bankruptcy at the offices of R. J. Bischoff & Co., when there was a crowd of people present, as well as the office force, standing on a table in Raymond J. Bischoff's private office, Charles W. Bischoff delivered a speech, telling them that they were having trouble on account of the banks, and that they should all stick together; that the banks were jealous because they only paid a small per cent and R. J. Bischoff & Co. paid a large one. Considering all the evidence, we do not feel that the verdict of the jury as to Charles W. Bischoff was erroneous.

The defendant, Earl Geer, married the sister of Raymond J. and Charles W. Bischoff in June, 1919. He had been in the army two years. He went to work for Raymond J. Bischoff in the spring of 1920. In the fall of that year he worked in the clerical department. He did make an investment in Y Oil & Gas Company stock. He claimed that he had no knowledge of the assets and liabilities of Raymond J. Bischoff, and that he believed in his solvency because he was successful in trading on the market. But there is evidence that he acted with more authority than a clerk and that he took part as a responsible executive. Geer not only took in money in the cage, but signed notes as attorney in fact for Raymond J. Bischoff. The evidence of Poska tends to show that Geer had considerable authority. Poska says that, when on the trip West, he had a talk with Raymond J. Bischoff in Geer's presence in regard to Geer's authority in the firm of R. J. Bischoff & Co. and that Bischoff said that Geer was manager and that everything that was said by Geer should be obeyed and carried out.

Darwin testified that in July or August, 1921, he talked with Raymond J. Bischoff while Geer was there; that Bischoff said, "Some time when I am not here in the office, Mr. Geer has got to do the same thing I do, what Mr. Geer says has got to be the same thing I say"; that he saw Geer sign several hundred notes "Raymond J. Bischoff by E. G. Geer, attorney in

fact," that he saw Geer at meetings of field agents, and, if Raymond J. Bischoff was not in the office, Geer would tell them about "specials." There is considerable evidence on this subject. It would be out of place to recite it here in detail; but considering it carefully, we are impelled to the conclusion that the verdict of the jury as to Earl Geer is not erroneous.

It is contended that there is no proof of intent, motive, design or concerted action with knowledge of the facts, no pursuit of a common purpose. That contention is answered by what the court said in *People v. Harrington,* 310 Ill. 613. In that case three men were indicted on a charge of obtaining money by means of the confidence game. The court said: "The evidence of the People, standing uncontradicted in the record as it does, justifies the conclusion that plaintiffs in error conspired to obtain the money of persons unskilled in business methods and unfamiliar with American customs. Having joined in the common scheme, each of the co-conspirators was liable for the acts and representations of his associates." In the instant case, Raymond J. Bischoff, Charles W. Bischoff, and Earl Geer were all taking a substantial and important part in the conduct of the business and, it is only reasonable to infer, from what the evidence shows, that they were together, by their joint efforts, knowingly obtaining money on a large scale from thousands of deluded and ignorant customers by false pretenses; in reality, by a form of confidence game, by cheating, by illegal methods that must, in all human probability, to their knowledge, lead speedily to disaster and loss. It is a fraud to conceal fraud. By such concealment, one becomes, in the eye of the law, an accomplice. It was not necessary to show whether or how each of the three was to participate in the receipts. It was sufficient to show that they participated in the conduct, the overt acts, which constituted,

considered as a whole, a conspiracy to obtain money by false pretenses or the confidence game.

In the *Harrington* case, *supra,* the court said:

"The returns which plaintiffs in error promised were many times larger than returns ordinarily expected from legitimate undertakings, and the natural inference to be drawn by any well-informed person would be that the proposition offered by plaintiffs in error was fraudulent. Plaintiffs in error represented to their customers that they had connections with Wall street and that they made these extraordinary returns by dealing in stocks and real estate. If these statements were true plaintiffs in error could have proven their truth. With nothing but the description of the scheme before them the jury were fully warranted in believing that the statements were false. The confidence game statute covers any scheme whereby a swindler wins the confidence of his victim and then swindles him of his money or property by taking advantage of the confidence fraudulently obtained. If the transaction is, in fact, a swindling operation, it is immaterial that the form assumed is that of a lawful business transaction."

*People v. Walinsky,* 300 Ill. 92; *Ochs v. People,* 124 Ill. 399.

It is urged that the evidence did not show a conspiracy to defraud the four specific persons named in the indictment. We think it did, and was sufficient to justify the verdict. *Lowell v. People,* 229 Ill. 227. The case of *People v. Mader,* 313 Ill. 277, is not in point. There the court found that the proof did not make out a case of conspiracy as charged.

It is contended that it was error to permit evidence of other offenses than those specifically charged. But where the evidence of other offenses tends to show the intent and knowledge, as to the illegal act charged, on the part of the conspirators, it is competent. Considering the situation as it existed, it was not only important, but logically apt, to show what was done in regard to other persons, such as Father Briszko, who were not specifically named in the indictment as hav-

ing been cheated. *People v. Pouchot,* 174 Ill. App. 1.

It is contended that the indictment charged four separate and distinct crimes, and that the motion of the defendants that the State elect as to which it would seek a conviction on should have been allowed. The crime charged was a misdemeanor and under the law it was a matter of reasonable discretion with the trial judge whether the motion should be allowed. Considering the nature of the case, we do not think the trial judge abused his discretion. *Lamkin v. People,* 94 Ill. 501; *People v. Munday,* 280 Ill. 32; *Johnson v. People,* 124 Ill. App. 213; *People v. Curran,* 286 Ill. 303. In the latter case the court said:

"It is claimed that the court erred in not requiring the People to elect upon which count or counts they would proceed. The conspiracies charged in the various counts were different parts of one conspiracy, and the right to demand an election does not apply in such a case." Citing *Andrews v. People,* 117 Ill. 195.

It is contended that a certain instruction, which was given, was erroneous, but in *People v. Strauch,* 240 Ill. 60, an instruction practically identical with the one here criticised was sanctioned, and *Spies v. People,* 122 Ill. 1, is cited in support of it.

After carefully considering all the evidence, and the law applicable thereto, we are of the opinion that the judgment as to Charles Bischoff must be affirmed.

*Affirmed.*

THOMSON, P. J., and O'CONNOR, J. concur.